Sheldon M. FUTERNICK, d/b/a Holiday West Mobile Home Park and d/b/a Holiday Woods Mobile Home Park, Plaintiff–Appellant,

v.

SUMPTER TOWNSHIP, Helen Teall, Barbara Dudek, Arness Cox and Louis Banotai, Sumpter Township Trustees; Marvin Banotai, Township Supervisor; Paul Johnson, Deputy Supervisor and Township Administrator; Joan Oddy, Township Clerk; John Morgan, Township Treasurer; Michigan Department of Natural Resources, Roland Harmes, Director; Michigan Department of Public Health, Vernice Davis Anthony, Director; Jon Caterino; and Michigan Mobile Home Commission, Defendants–Appellees.

No. 94–1902.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 6, 1996.

Decided March 13, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied April 25, 1996.

Mark A. Goldsmith (argued and briefed), Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Sheldon Futernick.

Julie McCann-O'Connor (briefed), Christopher T. Koch (argued), O'Connor, DeGrazia & Tamm, Bloomfield Hills, MI, for Sumpter Tp.

John C. Scherbarth, Asst. Attorney Gen. (argued and briefed), Office of the Attorney General, Natural Resources Div., Lansing, MI, for Michigan Dept. of Natural Resources, Michigan Mobile Home Com'n.

R. Phillip Brown (argued and briefed), Office of the Attorney General, Lansing, MI, for the Michigan Dept. of Public Health.

Before: MERRITT, Chief Judge, and CONTIE and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

Sheldon Futernick sued indiscriminately a host of state and local officials involved in regulating two mobile home parks that he owns and operates. He appeals from the district court's order dismissing all of his claims under Fed.R.Civ.P. 12(b)(6). Although we reverse the district court's erroneous decision regarding the Eleventh Amendment immunity of some of the named defendants, we affirm the district court's dismissal of all of Futernick's claims.

## I

Sheldon Futernick owns and manages two mobile home parks in Sumpter Township, Holiday Woods and Holiday West. His parks discharge treated sewage effluent into

surface water, pursuant to a permit issued by the Michigan Department of Natural Resources (MDNR).[1] On March 20, 1991, MDNR amended the permit to require substantial modifications to Futernick's mobile home parks by February 1, 1993. ("This was the most stringent permit issued to any mobile home park in ... the entire state of Michigan," complains Futernick in his brief to this court, estimating the cost of compliance to be over $700,000.) Futernick took little or no action in regard to the new permit requirements for at least a year.

In July 1992, Futernick had a series of meetings with Sumpter Township Supervisor Marvin Banotai to discuss a Township plan to construct a sewer system. The original plan included a sewer line running near Holiday West, but no line running near Holiday Woods. Futernick asked if a line could be extended to Holiday Woods, and Banotai agreed. Banotai sent confirming letters to Futernick announcing the plan to build a sewer accessible to both parks, and stating that the parks would be required to connect to the system.

Futernick then went to the state regulators and informed them that he planned to hook up to the Township sewer system—rendering unnecessary the costly improvements that his amended permit would require by February 1, 1993. Futernick's engineer, Seydou Diop, met with Barry Burns of the MDNR and Jon Caterino of the Michigan Department of Public Health (MDPH).[2] Diop summarized the results of the meeting in a letter to Burns and Caterino, dated August 19, 1992:

> Holiday Woods MPH [mobile park homes] will continue to operate as they are currently under the effluent limitations and monitoring requirements as set forth on page 2 of the current permit pending connection to the Sumpter Township sewer system.

Neither Burns nor Caterino voiced disagreement with this summary of their position immediately, and Futernick took no steps to upgrade his parks to meet the tougher effluent regulations.

On October 27, 1992, Caterino wrote Futernick, suggesting that the facility improvements would not be necessary if Futernick used the Township's sewer system, but also said that he had no "firm knowledge" that the Township planned to build such a system. He asked Futernick to begin the facility improvements necessary for compliance. Futernick responded by letter on November 4, stating that he interpreted Caterino's silence in light of the Diop letter to be an agreement to forestall regulation of Holiday Woods "until the Township brings the sewer to the Park and the Park has connected to the Township sewer."

Meanwhile, Futernick and the Township began to disagree on the terms of their earlier understanding. The Township says that Futernick promised to pay for the extension of the sewer line to Holiday Woods. Futernick denies that he promised to pay to connect either park to the new sewer line. The parties also disagree as to whether the Township obligated itself unconditionally to build the sewer line, or merely announced a potential plan. Sometime in early November 1992, Futernick told Township engineers that he would not pay for the extension of the sewer line to either of his parks. In response, the engineers stopped work on the proposed extension.

Everyone involved—Caterino (MDPH), Burns (MDNR), the Township, some county officials, Futernick, and Diop—met on November 17 at the request of Caterino. Futernick and Diop were only allowed to attend part of the meeting. At this meeting, the Township refused (for the first time, says Futernick; again, says the Township) to build the sewer to Futernick's parks unless Futernick paid a hook-up fee. Caterino and Burns also refused to excuse Futernick from compliance with the new regulatory permit unless Futernick agreed to do what was necessary to hook up to the Township's sewers.

---

1. MDNR recently changed its name to the Department of Environmental Quality (DEQ), but we use the old name in this opinion.

2. Although MDNR is responsible for issuing permits, MDPH is responsible for visiting sites and monitoring compliance. The local MDPH regulator is Jon Caterino.

The parties' various positions became further entrenched at a second meeting (this time without Futernick or Diop) on December 1, 1992. At this meeting, the Township told the state regulators the amount of the hook-up fee they required, and Caterino and Burns decided that Futernick would have to sign a contract agreeing to pay this amount before he would be excused from his state regulatory obligations. Apparently, the Township was under significant time pressure because of a commitment to their sewage processing contractor. The Township and the state regulators set a deadline of December 31, 1992, for Futernick's financial commitment. Futernick received letters to this effect on December 4, 9, 10, and 14.

Futernick did nothing. On February 3, 1993, Caterino issued a Notice of Noncompliance concerning Futernick's effluent discharge permit. On February 23, Caterino issued a Certificate of Noncompliance, which is the first step in a series of government actions that could eventually result in the closing of the mobile home park.

On March 9, 1993, Futernick filed his complaint in this action. He sued the Township and various Township officials, pursuant to 42 U.S.C. § 1983 and various state laws, to enjoin them from constructing a sewer system that did not include free hook-up status for Futernick. All claims against the Township were settled. Futernick agreed to pay $650,000 in hook-up fees ($400,000 for Holiday Woods and $250,000 for Holiday West), and the Township agreed to provide him with sewer service. The settlement was entered into the record of the proceedings. The district court dismissed the claims against the Township with prejudice. After Futernick moved for reconsideration, the district court amended its order so that the dismissal would be without prejudice.

Futernick also sued under § 1983 for injunctive relief against MDNR, MDPH, and Caterino, and for money damages against Caterino only, for violation of his right to equal protection of the law under the Fourteenth Amendment. On a Rule 12(b)(6) motion by the defense, the district court dis-

missed the claims against MDNR and MDPH on grounds of Eleventh Amendment immunity. The district court dismissed the claim for money damages against Caterino on grounds of qualified immunity. The court dismissed the claim for injunctive relief against Caterino because Caterino was merely enforcing a facially neutral state regulation and, therefore, the complaint failed to state a claim upon which relief could be granted.

Futernick filed a timely notice of appeal. He raises three issues that we now address. First, did the district court err by dismissing the claims against the Township because of the settlement? Second, did the court err by dismissing the claims against the directors of MDNR and MDPH on grounds of Eleventh Amendment immunity? Third, did the court err by dismissing the claims against Caterino because the complaint failed to state a claim upon which relief could be granted?

## II

■ The district court dismissed the claims against the Township without prejudice. Futernick claims that this dismissal was an impermissible alteration of the parties' settlement agreement, contrary to *Brown v. County of Genesee*, 872 F.2d 169 (6th Cir.1989) (court not permitted to change terms of a settlement before enforcing it). Futernick claims that the terms of the settlement required the court to retain jurisdiction of the case until the Township built the sewer line and hooked up Futernick. *See Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 405 (7th Cir.1974) (holding that district court abused discretion to dismiss case with prejudice when dismissal with prejudice was contrary to parties' settlement agreement), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975).

Futernick's argument fails because the settlement agreement says that the case will be stayed "with the court's permission."[3] Futernick argues that, despite this language, the court's acceptance of the settlement agreement *implied* that a stay would be granted. We do not believe that mere accep-

---

**3.** The oral settlement agreement was read into the record of the proceedings below. The rele-

vant portion of the agreement is set out at Appellant's Brief 4–6.

tance of a settlement agreement overcomes its express language—and therefore we will not conclude that the court's decision to dismiss is a "violation" of an agreement in which the court made no promise to the parties. Furthermore, the dismissal of the case without prejudice does not leave Futernick without an adequate remedy if promises made in the settlement agreement are not kept by the Township. At oral argument, counsel for Futernick admitted that an action for breach of contract has been filed in Michigan state court. Additionally, because the dismissal was without prejudice, Futernick remains free to renew his action in federal court.[4]

## III

■ Futernick's next allegation of error is essentially correct. The district court should not have dismissed the claims for injunctive relief against the directors of MDNR and MDPH on grounds of Eleventh Amendment immunity. Eleventh Amendment immunity does not bar injunctive relief against state officials for violations of federal law. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Thomson v. Harmony*, 65 F.3d 1314, 1320 (6th Cir.1995).

■ The district court held that *Young* did not apply because Futernick sued the directors in their official capacity, and sought relief from the department, rather than the directors themselves. That holding appears to be a confused extension of the rule that the Eleventh Amendment bars a suit against a state officer if that suit would lead to monetary relief against the state treasury (by some means other than indemnification).

The court's confusion probably stems from *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1983):

> The Eleventh Amendment bars a suit against state officials when the state is the 'real, substantial party in interest.' … regardless of whether [the plaintiff] seeks damages or injunctive relief.

*Id.* at 101–02, 104 S.Ct. at 908–09. It is error to read the language about the "party in interest" as an extension of Eleventh Amendment immunity to actions seeking injunctive relief against a state officer who is violating federal law. *Thomson*, 65 F.3d at 1320. To the extent the text of *Pennhurst* supports such a reading, it is overruled by *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Will* reaffirmed that state officers who are violating a federal law may *always* be sued for purely injunctive relief—"capacity" and "party in interest" are irrelevant. *Id.* at 71 n. 10, 109 S.Ct. at 2312 n. 10.[5]

Although the state agency defendants are not entitled to Eleventh Amendment immunity, we still affirm the dismissal of the case against these defendants. Futernick alleges (only) that these defendants violated his equal protection rights by selectively enforcing facially valid state environmental regulations. We affirm the dismissal of this case against these defendants for the same reason that we affirm the dismissal of the case against Jon Caterino in his personal capacity, as discussed immediately below: Futernick fails to state a claim upon which relief can be granted.

---

4. Futernick may not be able to seek contempt sanctions against the Township immediately, as he would have been able to had the district court retained jurisdiction or incorporated the settlement agreement into the order of dismissal. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. ——, ——, 114 S.Ct. 1673, 1677, 128 L.Ed.2d 391 (1994), held that a federal court does not have jurisdiction to enforce a settlement agreement reached in a dismissed action unless that settlement agreement was incorporated into the order of dismissal. But Futernick remains able, because the dismissal was without prejudice, to bring another § 1983 action in the same district court, if he can state a cognizable constitutional claim. Absent a showing as to why the threat of contempt sanctions is immediately

needed, there is no reason for us to conclude that the combined effect of these state and federal remedies is inadequate for Futernick's purposes.

5. The directors also argue that only the officer with immediate control over the challenged act or omission is amenable to § 1983. We find this claim ridiculous. Such a rule would allow a state agency to avoid, or defer, liability merely by transferring the defendant in a particular case, or by changing the scope of the defendant official's authority. The directors of a state agency, no matter how far removed from the actions of agency employees, are proper parties to a suit for an *injunction* under § 1983.

## IV

The heart of Futernick's case is the claim that state officials, especially Jon Caterino of MDNR, violated his constitutional right to equal protection of the law by selectively enforcing Michigan state environmental regulations. The district court dismissed the claim for injunctive relief against Caterino for failure to state a claim.[6] We review *de novo* to determine whether the complaint alleges "the material elements to sustain a recovery under some viable legal theory." *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993) (citation omitted).

■ There is no right under the Constitution to have the law go unenforced against you, even if you are the first person against whom it is enforced, and even if you think (or can prove) that you are not as culpable as some others who have gone unpunished. The law does not need to be enforced everywhere to be legitimately enforced somewhere; and prosecutors have broad discretion in deciding whom to prosecute. *Cf. Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (government's choice to prosecute only those draft violators who inform government of their intention not to register is not a violation of equal protection).

■ Sometimes the enforcement of an otherwise valid law can be a *means* of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement. Usually, a claim of selective enforcement arises as a defense in a criminal prosecution or regulatory enforcement action. In this context, the court should dismiss a case, or take other appropriate action, if the defendant can prove that the prosecutor or investigator intentionally "singled him out" for punishment because of membership in a protected group or the exercise of a constitutionally protected right. *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir.1991) (criminal prosecution); *Schehl v. Comm'r of Internal Revenue Serv.*, 855 F.2d 364, 367 (6th Cir.1988) (civil action for penalties).[7]

■ Selective enforcement can also lead to § 1983 liability if the plaintiff pleads "purposeful discrimination" intended to accomplish some forbidden aim. *Birth Control Ctrs., Inc. v. Reizen*, 743 F.2d 352, 359–60 (6th Cir.1983) (affirming trial court's finding that state officials did not *intentionally* discriminate against abortion clinics when enforcing surgical clinic licensing regime); *Wright v. MetroHealth Medical Ctr.*, 58 F.3d 1130, 1137 n. 7 (6th Cir.1995) (dismissing plaintiff's claim that hospital selectively enforced employment policy because plaintiff did not allege any impermissible intent). *See generally Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962) ("the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" if "the selection was [not] deliberately based upon an unjustifiable standard").

---

**6.** The court dismissed the money damages claim against Caterino on grounds of qualified immunity. Since a holding that Futernick failed to state a claim for constitutional relief under Rule 12(b)(6) necessarily includes a holding that Futernick cannot show that Caterino violated a constitutional right of which any reasonable official in his situation would have been aware, it seems prudent to address the 12(b)(6) dismissal first.

**7.** We have differentiated the two types of selective prosecution claims. True "selective prosecution" requires the plaintiff to show: (1) membership in a protected group; (2) prosecution; (3) that others in a similar situation not members of the protected group would not be prosecuted; and (4) that the prosecution was initiated with discriminatory intent. *Anderson*, 923 F.2d at 453. "Vindictive prosecution" is prosecution to deter or punish the exercise of a constitutionally protected right. The plaintiff must show: (1) exercise of a protected right; (2) the prosecutor's "stake" in the exercise of that right; (3) the unreasonableness of the prosecutor's conduct; and, presumably, (4) that the prosecution was initiated with the intent to punish the plaintiff for exercise of the protected right. *Ibid. See also United States v. Hazel*, 696 F.2d 473 (6th Cir. 1983) (holding that prosecution of particularly notorious tax evaders is not a violation of equal protection because prosecution was motivated by notoriety of offenders, not the offender's actual speech); *United States v. Andrews*, 633 F.2d 449, 457 (6th Cir.1980) (Merritt, J., dissenting, discussing requirements for a valid vindictive prosecution claim).

This circuit has not squarely addressed the question of what aims are forbidden ones for the purposes of a selective enforcement action under § 1983. It seems clear to us that intentional selective enforcement because of race, nationality, religion, or gender is grounds for § 1983 relief. *Oyler* itself says "race, religion, or other arbitrary classification." 368 U.S. at 456, 82 S.Ct. at 506. The term "arbitrary classification" implies that certain other group distinctions could be a basis for liability—such as the alleged focus on abortion clinics in *Birth Control Centers*, 743 F.2d at 359. Protecting certain other groups from selective enforcement may fit the slightly heightened "rational basis scrutiny" given to suspicious classifications by equal protection jurisprudence generally. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (striking requirement that home for the mentally retarded obtain a special use permit); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (striking Texas law excluding immigrants from free public education).[8]

▆▆▆ It is also clear that selective enforcement intended to discourage or punish the exercise of a constitutional right, especially the right to criticize the government, is sufficient basis for § 1983 relief. The availability of § 1983 relief for what we have called "vindictive enforcement," *Anderson*, 923 F.2d at 453, seems a necessary corollary to the defense recognized in free speech cases like *Wayte*, 470 U.S. at 608–10, 105 S.Ct. at 1531–32, and *Hazel*, 696 F.2d at 473. Of course, as the eventual failure of the plaintiffs' claims in *Wayte* and *Hazel* indicates, the plaintiff must prove intent to punish for the act of speech, rather than intent to concentrate limited resources on the most notorious or easy to locate violators.

▆▆▆ Futernick, however, does not claim to be a member of any group, nor does he claim that Caterino is punishing him for exercising a constitutional right. Instead, he claims that relief under § 1983 is available because Caterino selectively enforced the law "maliciously" and in "bad faith."[9] This circuit has not yet decided if an allegation of malice is sufficient to state a claim of selective enforcement. Futernick argues that we have, citing *United States v. Bustamante*, 805 F.2d 201, 202 (6th Cir.1986), where we stated that a plaintiff must show "bad faith." Futernick neglects to mention that *Bustamante* defined "bad faith" as "based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights." *Ibid.* The question remains open whether malice or personal animosity is a constitutionally impermissible consideration.[10]

The First and Second Circuits have stated that they will allow § 1983 relief against a state official who selectively enforces a law or regulation out of malice, but without the intent to injure a group or punish the exercise of a constitutional right. *E.g., LeClair v. Saunders*, 627 F.2d 606, 610 (2nd Cir.1980) (§ 1983 action can be based on group membership, the exercise of fundamental rights, or "malicious or bad faith intent to injure a person"). To our knowledge, however, neither court, despite the citation of general language indicating the possibility of a successful action, has ever affirmed a victory for the plaintiff on such a theory. *See Yerardi's Moody Street Restaurant & Lounge v. Board of Selectmen*, 932 F.2d 89, 92–94 (1st Cir.

---

8. On the other hand, every "arbitrary classification" cannot be a basis for liability. Mere arbitrariness—prosecuting everyone whose first name begins with the letter A, for example—does not indicate any constitutionally impermissible intent. *E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir.1987). In fact, random choice may be one of the *most* sensible methods to allocate "equally" finite enforcement resources.

9. The complaint alleges "purposeful discrimination aimed specifically" at Futernick, without any allegation of impermissible intent. Com-

plaint at 15. In his arguments below and in briefs to this court, Futernick expounds on the otherwise insufficient allegation in his complaint. He alleges "malice" and "bad faith," and supplies two possible motives for Caterino's actions: first, that Caterino personally dislikes Futernick; and second, that Caterino is conspiring with the Township to allow the Township to charge Futernick an exorbitant sewer hook-up fee.

10. We also suggested that such a claim would be possible in dicta in a footnote in *Wright*, 58 F.3d at 1137 n. 7.

1991) (defendant city board entitled to directed verdict because evidence of malice was insufficient); *Yerardi's Moody Street Restaurant & Lounge v. Board of Selectmen,* 878 F.2d 16, 20–21 (1st Cir.1989) (individual defendants entitled to qualified immunity); *Rubinovitz v. Rogato,* 60 F.3d 906, 911 (1st Cir.1995) (affirming grant of summary judgment because evidence of malice is insufficient); *LeClair,* 627 F.2d at 606 (reversing judgment for plaintiff at trial because evidence of malice is insufficient); *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992) (affirming grant of summary judgment because evidence of malice insufficient). *See also Rubinovitz,* 60 F.3d at 911–12 (successful claims for malicious prosecution in violation of the equal protection clause should be "infrequent"); *Cornett v. Sheldon,* 894 F.Supp. 715, 723 (S.D.N.Y.1995) (dismissing claims for selective prosecution because conclusory allegation of malice in complaint not supported by the allegation of specific facts).

We cited the Second Circuit's statement in *FSK Drug* in dicta in *Wright v. MetroHealth Medical Center,* 58 F.3d 1130, 1137 n. 7 (6th Cir.1995). In *Wright,* however, the issue of selective enforcement was not addressed because the plaintiff did not raise it below, and because the plaintiff made *no* allegation as to the defendant's intent. Now that we are presented with the facts of an actual case, we believe that it would be unwise to adopt the often-stated, but never-used, rule of the First and Second Circuits.[11]

The Supreme Court in *Oyler* mentions only arbitrary *classifications* as a basis for selective enforcement liability. 368 U.S. at 456, 82 S.Ct. at 506. *Accord Wayte,* 470 U.S. at 608 n. 10, 105 S.Ct. at 1531 n. 10 (citing *Castaneda v. Partida,* 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) and *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). We do not believe that choosing to enforce the law

against a particular individual is a "classification" as that term is normally understood. *Webster's Third New International Dictionary* 417 (1986) (defining "classify" as "to group or segregate in classes that have systematic relations usually founded on common properties or characters; sort").

Furthermore, we see compelling reasons that the sundry motivations of local regulators should *not* be policed by the Equal Protection Clause of the United States Constitution, absent the intent to harm a protected group or punish the exercise of a fundamental right. The sheer number of possible cases is discouraging. Legislatures often combine tough laws with limited funding for enforcement. A regulator is required to make difficult, and often completely arbitrary, decisions about who will bear the brunt of finite efforts to enforce the law. As a result, even a moderately artful complaint could paint almost any regulatory action as both selective and mean-spirited.

Recognizing this dilemma, the First Circuit limits the availability of § 1983 for a regulator's malice by requiring that the plaintiff prove that others who are similarly situated in "all relevant aspects" have not been regulated. *Rubinovitz,* 60 F.3d at 910 (citing *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989)). Strict adherence to this initial requirement allows only cases of *extraordinary* selectivity to state a claim. However, we are uncertain if a focus on similarly situated persons works as a screening device. Determining "all relevant aspects" of similar situations usually depends on too many facts (and too much discovery) to allow dismissal on a Rule 12(b)(6) motion. If we require defendants to wait until summary judgment, we burden local and state officials with the regular prospect of "fishing expeditions" and meritless suits.[12] In the meantime we federalize and

---

**11.** Other circuits that have stated the prima facie case for a claim of selective enforcement have not mentioned malice or intent to injure an individual on the part of the prosecutor or regulator. *E.g., Government of the Virgin Islands v. Harrigan,* 791 F.2d 34, 36 (3d Cir.1986) (forbidden aims include intent to injure a group and intent to punish exercise of fundamental rights); *Stern v. Tarrant County Hosp. Dist.,* 778 F.2d 1052,

1058 (5th Cir.1985) (same); *E & T Realty v. Strickland,* 830 F.2d 1107, 1114 (11th Cir.1987) (§ 1983 plaintiff must show intent to injure group).

**12.** Futernick's claim is typical. After apparently mammoth discovery from the Township and the state, Futernick has accumulated evidence that other mobile home parks in the area discharged

constitutionalize what are essentially issues of local law and policy.

The nature of the right to equal protection also counsels against expanding a federal right to protection from non-group animosity on the part of local officials. It is clearly not a violation of equal protection if a local regulator, faced with limited resources, picks people to regulate in a perfectly random manner. *Supra* n. 8. Similarly, the presence of personal animosity should not turn an otherwise valid enforcement action into a violation of the Constitution. From a constitutional perspective, personal animosity not related to group identity or the exercise of protected rights is as *random* as the roll of a dice. There is no constitutionally significant category of people that have a greater or lesser chance of being affected by it. The Constitution's protection begins only when the *incidence* of the burden of regulation becomes constitutionally suspicious.

We certainly do not sanction the abuse of state or local regulatory power. Regulation out of personal dislike or vendetta is repugnant to the American tradition of the rule of law. However, the states themselves are vibrant defenders of this tradition. *Cf. Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 888 (2d Cir.1987). ("Section 1983 is not a means for litigating in a federal forum whether a state or local administrative decision was arbitrary and capricious.") Those affected by the unfair regulator have recourse to the state political processes that appointed that regulator in the first place. State courts or the state constitution may provide protection. Additionally, in extreme cases, the defendant in a regulatory action may have federal due process claims, reviewable by the Supreme Court of the United States by writ of certiorari. *Cf. Sun Valley Foods v. Ficano*, 801 F.2d 186, 189 (6th Cir.1986) (defendant in enforcement action cannot retry case in federal court simply by invoking § 1983; federal courts have no jurisdiction to hear cases proceeding in state court or decided by state courts, and state court defendant's only recourse is possible Supreme Court review). Absent a breakdown in the state's normal political process that unfairly affects a protected group or the exercise of constitutional rights, we can and should trust states to police adequately their own processes.

Our discussion suggests that there is a difference between the general doctrine of equal protection—relevant when the plaintiff is challenging a classification made by state law—and the doctrine of selective enforcement. When the plaintiff challenges a classification made by state law, the state must show that the classification is rationally related to a legitimate state purpose, regardless of the nature of the classification or the persons it affects. *See, e.g., McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964) ("The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose.").[13] In selective enforcement doctrine, however, the characteristics used to select some people to prosecute or regulate need not be rationally related to a state need. The difference is due to the discretion to initiate government action traditionally given state officials. It is

---

sewage into the ground water without a permit. The record also contains evidence that other mobile home parks in the area were excused from sewage regulations on vague promises that they would hook up to the local sewer system.

The state defendants can easily rebut this evidence and show that Futernick is not "similarly situated"—essentially a demonstration that there is some rational reason why prosecuting only Futernick makes sense. As to the discharge of effluent without a permit by other mobile home parks, Caterino cannot regulate these parks because his jurisdiction is limited to enforcing the conditions of permits already issued by MDNR. As to Caterino's decision to excuse other mobile home parks on the vague promise of hook-up to local sewer systems, none of the other mobile homes have expressly refused to pay hook-up fees as has Futernick. Eventually winning these points, however, does not relieve the Township—or any future defendant—of the burden of producing the documents and litigating the suit up to the point of dismissal.

**13.** That requirement is often criticized because courts change the potency of rational basis scrutiny according to the outcome that will result from its application, *see generally*, Laurence H. Tribe, *American Constitutional Law* 1443–50 (2d ed. 1988) (courts "covertly" heighten scrutiny as classifications become more suspect, and lower scrutiny as classifications become more mundane), but it remains the general method of equal protection analysis.

also due to the legitimate and practical necessity for a state somehow to choose to prosecute or regulate only part of the group of people who may be violating the law, and to do so without subjecting the selection decision to micro-management by courts.

For these reasons, we hold that the choice of whom to prosecute or cite for a violation of an otherwise valid law or regulation is constitutionally troublesome only when it is blemished by the intent to harm a protected group or punish a person for the exercise of a constitutionally protected right. Because Futernick does not allege either of these forbidden aims, his § 1983 action fails to state a claim upon which relief can be granted.

### V

Although the district court erred by holding that the directors of MDNR and MDPH were entitled to sovereign immunity, we AFFIRM the dismissal of the entire action.