# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

**FILED**

**April 23, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| NATIONAL LOANS, INC., | ) | |
| Jackson, Tennessee, | ) | |
| Memphis, Tennessee, | ) | |
| Milan, Tennessee, | ) | |
| | ) | |
| Petitioner/Appellant, | ) | Davidson Chancery |
| | ) | No. 92-1518-I |
| VS. | ) | |
| | ) | Appeal No. |
| TENNESSEE DEPARTMENT OF | ) | 01A01-9506-CH-00241 |
| FINANCIAL INSTITUTIONS, | ) | |
| | ) | |
| Respondent/Appellee. | ) | |

## APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY AT NASHVILLE, TENNESSEE

### THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

For the Petitioner/Appellant:

William B. Hubbard
Brenner Lackey Van Meter
Weed, Hubbard, Berry & Doughty
Nashville, Tennessee

W.J. Michael Cody
Burch, Porter and Johnson
Memphis, Tennessee

Lynn Fitch Mitchell
Holcomb, Dunbar, Connell, Chaffin & Willard
Jackson, Mississippi

For the Respondent/Appellee:

Charles W. Burson
Attorney General and Reporter

Michael E. Moore
Solicitor General

Janet M. Kleinfelter
Assistant Attorney General

For the Intervenors:

Val Sanford
Gullett, Sanford, Robinson
& Martin
Nashville, Tennessee

## AFFIRMED IN PART; REVERSED IN PART; AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves the revocation of the certificates of registration of three branch offices of an industrial loan and thrift company. The Commissioner of Revenue, sitting for the Commissioner of Financial Institutions, revoked the certificates after determining that the company's real estate loan charges and its handling of credit life insurance death claims violated the Industrial Loan and Thrift Act. The company sought judicial review in the Chancery Court for Davidson County. After remanding the case for discovery relating to the company's selective enforcement claim, the trial court affirmed the revocation of two of the branch offices' certificates and reversed the revocation of the third office's certificate. The company asserts on this appeal that the administrative law judge improperly limited additional discovery concerning its selective enforcement claim, that the Department of Financial Institutions was selectively enforcing the Industrial Loan and Thrift Act, and that the revocation of the certificates of its two branch offices was not supported by substantial and material evidence. The Department asserts that the trial court erred by reversing its revocation of the third branch office's certificate. We have determined that additional discovery concerning the selective enforcement claim was not warranted, that the Department did not selectively enforce the Industrial Loan and Thrift Act, and that the evidence supports the revocation of all three branch offices' certificates of registration.

## I.

National Loans, Inc. is an industrial loan and thrift company originally incorporated in Mississippi in 1974. It opened its first Tennessee branch office in Milan in 1986. Over the next two years, it opened other branch offices in Collierville and Jackson. National Loans was operating twenty branch offices in Tennessee and Mississippi at the outset of this enforcement proceedings.

In 1990 the Department of Financial Institutions learned that an industrial loan and thrift company doing business in both Mississippi and Tennessee had been expelled from the Mississippi Independent Association. During a review of

the examination records of three industrial loan and thrift companies doing business in both Mississippi and Tennessee, the assistant commissioner responsible for overseeing the regulation of the loan and thrift industry in Tennessee discovered a transaction in which National Loans' branch office in Jackson had deposited the proceeds from a joint credit life insurance policy in its own account rather than immediately paying over the proceeds to its customer's estate. The assistant commissioner eventually ordered examinations of all of National Loans' branch offices in Tennessee after verifying that the customer's estate had never received the insurance proceeds and after a review of six to eight other examination files revealed that the company consistently retained credit life proceeds rather than paying them over to its customers' estates.

Department representatives examined National Loans' three Tennessee branch offices in August 1990. They were unable to examine the credit life transactions at the Milan branch office because it did not provide them the required insurance claim log. The examinations uncovered one loan at the Jackson branch office and three loans at the Collierville branch office in which the company had attempted to convert the credit life insurance proceeds to its own use. In these transactions, National Loans' employees had forged endorsements on insurance checks made payable to its customers' estates and had deposited these checks in a central company suspense account. Later, the company issued one or more checks to their customers' estates but again deposited these checks into a company account over another forged endorsement.

The examinations also uncovered fourteen other transactions in which all three branch offices had violated Tenn. Code Ann. § 45-5-403(1)(B) (Supp. 1996) by charging customers a four percent service charge in addition to third-party expenses.[1] These transactions represented every real estate loan made by National Loans' three branch offices in Tennessee.

---

[1]Tenn. Code Ann. § 45-5-403(1)(B) permits industrial loan and thrift companies to charge either a four percent service charge or "the actual, bona fide, reasonable expenses, directly incident to the loan, paid or to be paid . . . to third parties, including, but not limited to, expenses for title examination or title insurance, surveys, preparation or necessary documents, credit reports and appraisals" but not both.

The Mississippi Department of Banking and Consumer Finance commenced a special investigation into National Loans' use of the proceeds of the joint credit life insurance policies on September 14, 1989.[2] Less than one week later, National Loans mailed the insurance proceeds to the estates of its insured customers. In similar fashion, National Loans began to refund the overcharges on its real estate loans in Tennessee after the Department commenced the special examination at issue in this case.

Armed with the examination results, the Department of Financial Institutions commenced administrative proceedings to revoke the registration certificates of National Loans' three branch offices in Tennessee. At the hearing before an administrative law judge, the Department presented Mississippi and Tennessee regulators as well as former National Loans employees to testify about National Loans' corporate policies with regard to real estate loan charges and credit life insurance death claims. National Loans stipulated during the hearing that its company-wide policy was to charge both the four percent service charge and the third-party expenses on its real estate loans. National Loans' president and vice president for Tennessee operations also conceded that the company routinely forged endorsements on checks payable to the estates of their deceased borrowers and deposited these checks in a corporate suspense account.

After the hearing, National Loans learned that the Department had also examined American General Finance, Inc., a Tennessee industrial loan and thrift company, for collecting excessive fees in real estate transactions. With the Department's permission, National Loans reviewed American General's examination file and discovered that the Department had permitted American General to reimburse a number of customers for loan overcharges without commencing formal enforcement proceedings. The administrative law judge later denied National Loans' request to reopen the record to present evidence of discrimination by the Department.

---

[2]Later, in July 1990, the Mississippi regulators commenced administrative proceedings of their own to revoke National Loans' license to do business in Mississippi. This action was eventually settled.

On January 23, 1992, the administrative law judge issued an initial order finding that the certificates of registration of all three of National Loans' branch offices in Tennessee should be revoked because of the illegal real estate loan charges and the fraudulent handling of credit life insurance proceeds. In April 1992 the Commissioner of Financial Institutions affirmed the initial order. National Loans filed a petition for review in the Chancery Court for Davidson County in May 1992 and continued to review American General's examination files for evidence of additional overcharges. In August 1992 National Loans sought the trial court's permission to introduce additional evidence supporting its selective enforcement claim and also requested the trial court to remand the case for further discovery on the issue. The trial court thereupon remanded the case to the administrative law judge to allow discovery and further consideration of National Loans' selective enforcement claim.

The remand order triggered a discovery dispute that lasted eighteen months. National Loans demanded virtually unlimited access to all the Department's enforcement records concerning every industrial loan and thrift company doing business in Tennessee; while the Department sought to limit the discovery to American General's examination files. The administrative law judge permitted National Loans to submit interrogatories to the Department's examiners concerning their memories of violations by any industrial loan and thrift company. As the dispute wore on, the administrative law judge ordered the Department to make available examination files involving first three, then eleven other industrial loan and thrift companies. The administrative law judge also directed that these records be placed under seal and made available only to National Loans' attorneys.

Both parties appealed the administrative law judge's discovery orders to the trial court. After the trial court quashed National Loans' efforts to subpoena additional witnesses after the discovery deadline, National Loans' lawyers requested the trial court to lift the protective order to enable their client to review the documents and to aid in the presentation of its selective enforcement claim. The trial court denied the motion, but not before it permitted four other industrial

loan and thrift companies to intervene to protect the confidentiality of their records.

On March 4, 1994, the administrative law judge entered an initial order confirming the findings of fact in its January 23, 1992 order as well as its conclusion that the certificates of registration of National Loans' three branch offices in Tennessee should be revoked. The administrative law judge also found that the evidence presented following the remand did not substantiate National Loans' selective enforcement claim. National Loans appealed the initial order to the Commissioner of Financial Institutions.

The Commissioner of Financial Institutions recused himself because National Loans had filed a civil rights action against him in the Circuit Court for Gibson County alleging that he was using the Industrial Loan and Thrift Act to harass and selectively prosecute the company. The Governor, acting pursuant to Tenn. Code Ann. § 4-5-302(e)(1) (1991), appointed the Commissioner of Revenue to preside over the enforcement proceedings in place of the Commissioner of Financial Institutions. Thereafter, the Commissioner of Revenue denied National Loans' renewed motion to lift the protective order and, on June 10, 1994, entered a final order adopting the administrative law judge's findings. The Commissioner of Revenue revoked the certificates of registration issued to National Loans' three branch offices in Tennessee. In doing so, the Commissioner noted that "the record reflects testimony by company employees that there was a company policy and continuing practice with regard to charges in excess of the amounts statutorily allowed on real estate loans."

The Department of Financial Institutions filed the supplemental record with the trial court in July 1994. On March 27, 1995, the trial court filed a memorandum opinion affirming the revocation of the certificates of registration of National Loans' branch offices in Jackson and Collierville. The trial court reversed the revocation of the Milan branch office's certification of registration on two grounds. First, the trial court pointed out that there was no proof that the Milan branch office had misappropriated the proceeds of joint credit life insurance policies; second, the court concluded that the Commissioner acted arbitrarily by

applying the character and fitness standards in Tenn. Code Ann. § 45-5-201(a) (Supp. 1996) to an industrial loan and thrift company that was already operating.

## II.
### NATIONAL LOANS' SELECTIVE ENFORCEMENT CLAIM

We turn first to the issues surrounding National Loans' selective enforcement claim. National Loans asserts that the administrative law judge improperly limited its ability to substantiate this claim and that the proof establishes that the Department was selectively enforcing the Industrial Loan and Thrift Act. The intervening industrial loan and thrift companies assert that the Department should not have been required to divulge the enforcement records pertaining to them because National Loans had not made a threshold showing that it was entitled to additional discovery.[3] We have determined that National Loans failed at the outset to come forward with some credible evidence tending to show that improper selective enforcement had occurred. Accordingly, we pretermit the discovery issues and find that the trial court erred by remanding the case for additional discovery concerning National Loans' selective enforcement claim.

## A.
### SELECTIVE ENFORCEMENT CLAIMS IN GENERAL

State and local officials have broad discretion with regard to their enforcement and prosecution decisions as long as they have a reasonable basis to believe that a violation of a statute or regulation has been committed. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 668 (1978); *Patterson v. Hunt*, 682 S.W.2d 508, 517 (Tenn. Ct. App. 1984). Unwarranted judicial intervention in enforcement or prosecution decisions can chill enforcement of the

---

[3]We disagree with National Loans' assertion that the intervenors' arguments are either moot or not properly before the court. The intervenors are aggrieved persons for the purpose of Tenn. Code Ann. § 4-5-322(a)(1) (Supp. 1996). While the Department of Financial Institutions has already divulged its enforcement records concerning the intervenors, the issue concerning the disclosure of proprietary information contained in the Department's enforcement records is one of great public interest and importance to the administration of justice and is likewise capable of repetition yet evading review. *Walker v. Dunn,* 498 S.W.2d 102, 104 (Tenn. 1972) (recognizing an exception to the mootness doctrine for issues of great public interest and importance); *Bemis Pentecostal Church v. State,* 731 S.W.2d 897, 903 (Tenn. 1987) (recognizing an exception to the mootness doctrine for issues capable of repetition yet evading review).

law and can hamper or even frustrate government effectiveness. *United States v. Armstrong,* ___ U.S. ___, ___, 116 S. Ct. 1480, 1486 (1996); *Wayte v. United States,* 470 U.S. 598, 607-08, 105 S. Ct. 1524, 1530-31 (1985). Thus, the doctrine of separation of powers embodied in Tenn. Const. art. II, §§ 1 and 2 counsels the courts to proceed cautiously when asked to scrutinize enforcement or prosecution decisions by state and local officials.

Regulation based on personal dislike, vendetta, or some other impermissible consideration is repugnant to the American tradition of the rule of law. *See Futernick v. Sumpter Township,* 78 F.3d 1051, 1059 (6th Cir. 1996). Accordingly, a public official's enforcement discretion is subject to constitutional constraints. *United States v. Batchelder,* 442 U.S. 114, 125, 99 S. Ct. 2198, 2204-05 (1979). One of these constraints, imposed by the Equal Protection Clause of the Fourteenth Amendment, Tenn. Const. art. I, § 8, and Tenn. Const. art. XI, § 8,[4] is that prosecution or enforcement decisions may not be based on some impermissible consideration. *Wayte v. United States*, 470 U.S. at 608, 105 S. Ct. at 1531; *State v. Martin*, 719 S.W.2d 522, 525 (Tenn. 1986); *Irvin v. City of Clarksville*, 767 S.W.2d 649, 654 (Tenn. Ct. App. 1988). This "murky corner of equal protection law" is commonly known as "selective enforcement" or "selective prosecution." *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir. 1980).

Persons asserting selective enforcement claims have a heavy burden to overcome the presumption that public officials are performing their duties in good faith, *Williams v. American Plan Corp.,* 216 Tenn. 435, 441, 392 S.W.2d 920, 923 (1965), and in accordance with the law. *Reeder v. Holt,* 220 Tenn. 428, 435-36, 418 S.W.2d 249, 252 (1967). They must prove more than that the public official has enforced the law in some instances but not in others. *State v. Martin*, 719 S.W.2d at 525; *Irvin v. City of Clarksville*, 767 S.W.2d at 654. Equal protection does not require that all evils of the same genus be eradicated or none at all. *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 69 S. Ct. 463, 466 (1949). Accordingly, there is no right to have the law go unenforced even if other

---

[4]The Tennessee Supreme Court has equated Tenn. Const. art. XI, § 8 with the Fourteenth Amendment in considering a challenge to a statute on the ground that it permitted prosecutorial selectivity. *Goldston v. City of Harriman,* 565 S.W.2d 858, 861 (Tenn. 1978).

persons who may be equally or more culpable have gone unpunished. *Futernick v. Sumpter Township,* 78 F.3d at 1056.

Persons claiming selective enforcement must prove that the enforcement decision had a discriminatory purpose and has produced a discriminatory effect. *United States v. Armstrong,* ___ U.S. at ___, 116 S. Ct. at 1487; *Wayte v. United States,* 470 U.S. at 608-09, 105 S. Ct. at 1531. Thus, in order to make out a prima facie case of selective enforcement, they must prove (1) that they have been singled out for prosecution while others similarly situated have generally not been prosecuted for the same type of conduct and (2) that the decision to prosecute them rests on an impermissible consideration. *United States v. Hazel,* 696 F.2d 473, 474 (6th Cir. 1983); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974).

With regard to the first element of a selective enforcement claim, proof that others have not been prosecuted for essentially the same type of conduct must consist of evidence that (1) other non-prosecuted offenders engaged in essentially the same conduct, (2) the non-prosecuted offenders violated the same statute or regulation that the claimant is accused of violating, and (3) the magnitude of the non-prosecuted offenders' violations was not materially different from that of the person claiming selective enforcement. *United States v. Cyprian,* 756 F. Supp. 388, 393 (N.D. Ind. 1991). The impermissible considerations required by the second element of the claim consist of considerations based on race, gender, religion, or some other arbitrary classification such as the exercise of statutory or constitutional rights. *Wayte v. United States,* 470 U.S. at 608, 105 S. Ct. 1531; *Futernick v. Sumpter Township,* 78 F.3d at 1056-59.

## B.

### DISCOVERY WITH REGARD TO SELECTIVE ENFORCEMENT CLAIMS

Selective enforcement claims are difficult to prove. They generally require evidence gleaned from government files that are not generally subject to discovery. *Wayte v. United States,* 470 U.S. at 624, 105 S. Ct. at 1539 (Marshall, J., dissenting); *United States v. Bourgeois,* 964 F.2d 935, 938 (9th Cir. 1992);

*United States v. Heidecke,* 900 F.2d 1155, 1158 (7th Cir. 1990). Thus, when persons claiming selective enforcement request access to government enforcement records in order to obtain evidence to prove their claims, the courts must balance the government's legitimate interests with those of the party seeking to substantiate a selective enforcement claim.

Because of the unavailability of evidence to substantiate a selective prosecution claim, the courts have generally applied a lesser standard of proof to warrant discovery than is required ultimately to prove selective enforcement. *United States v. Berrios,* 501 F.2d at 1211-12. In order to be entitled to discovery, a party claiming selective enforcement must come forward with some credible evidence tending to show the existence of discriminatory effect and discriminatory intent. *United States v. Armstrong,* ___ U.S. at ___, 116 S. Ct. at 1488.[5]

## C.
### NATIONAL LOANS' THRESHOLD SHOWING

National Loans' threshold showing of selective enforcement consisted of evidence of the Department's enforcement activities involving American General. National Loans did not claim to be a member of a protected class and did not attribute an improper, discriminatory motive to the Department. Rather, it simply asserted that the Department had not commenced enforcement proceedings against American General even though the company had collected the same fees and had violated the same statute.

A regulatory agency's decision to enforce a statute or regulation in some cases but not in others may entitle the person subjected to formal enforcement proceedings to an explanation from the agency. *Baltimore Gas & Elec. Co. v. Heintz,* 760 F.2d 1408, 1419 (4th Cir. 1985). In this case, the Department went

---

[5]Prior to the United States Supreme Court's decision in *United States v. Armstrong*, the state and federal courts had adopted several labels for the requisite showing needed to be entitled to discovery. The most common label was "colorable basis." *See, e.g., United States v. Lopez,* 71 F.3d 954, 963 (1st Cir. 1995); *State v. Palmgren,* 646 P.2d 1091, 1096 (Kan. 1982). Other courts required a "nonfrivolous showing," *see, e.g., United States v. Greenwood,* 796 F.2d 49, 52 (4th Cir. 1986); *Jones v. Missouri Dental Bd.,* 687 S.W.2d 579, 581 (Mo. Ct. App. 1985), or a "prima facie" showing. *See, e.g., United States v. Parham,* 16 F.3d 844, 846 (8th Cir. 1994); *Federov v. United States,* 580 A.2d 600, 608 (D.C. 1990).

beyond providing an explanation and actually granted National Loans access to the enforcement files concerning American General.[6] These records contained no evidence of improper motive and also demonstrated that American General had not engaged in the same type of conduct as National Loans.

The Department's enforcement records did not indicate that American General had misappropriated credit life insurance proceeds by forging endorsements on insurance checks.[7] In addition, they demonstrated that American General had not engaged in the same type of conduct as National Loans. All three of National Loans' branch offices in Tennessee had violated Tenn. Code Ann. § 45-5-403(1)(B) in every real estate loan they had made. On the other hand, American General had violated the general usury laws in approximately seventy of its 400,000 accounts. These loans were federally exempt from state regulation under the Industrial Loan and Thrift Act, and American General had reimbursed it customers.

At the time National Loans first asserted its selective prosecution claim in the trial court, the evidence showed convincingly that American General had not violated the same statute that National Loans was accused of violating and that the magnitude of American General's violations was not the same as that of National Loans. Accordingly, the trial court should have found that National Loans had not presented credible evidence of selective enforcement and, therefore, should have denied its request to remand the case to the administrative law judge for additional discovery to substantiate its selective enforcement claim.

## III.

### APPLICATION OF TENN. CODE ANN. § 45-5-201(A)(1) TO REVOCATION PROCEEDINGS

---

[6]We do not decide in this case whether a regulatory agency must in all circumstances provide a person asserting selective enforcement with access to its enforcement files or whether an explanation of its decision will suffice.

[7]A Department representative stated he would not have hesitated to commence formal proceedings had the Department discovered that American General had been forging documents. The administrative law judge also noted that the Department had revoked the registration of the only other entity "shown to have engaged in fraudulent activities through forging documents."

We turn next to the trial court's conclusion that the general fitness requirements in Tenn. Code Ann. § 45-5-201(a)(1) cannot provide a basis for revoking the registration of an industrial loan and thrift company. We do not agree with the trial court's restrictive interpretation that the general qualification for registration apply only to applicants for initial registration.

When construing a statute, the courts must ascertain and give the fullest possible effect to the legislative purpose expressed in the words of the statute itself. *Sharp v. Richardson,* 937 S.W.2d 846, 849 (Tenn. 1996); *Pursell v. First Am. Nat'l Bank,* 937 S.W.2d 838, 840 (Tenn. 1996). We must derive the statute's purpose from the plain and ordinary meaning of its language, *Tuggle v. Allright Parking Sys., Inc.,* 922 S.W.2d 105, 107 (Tenn. 1996), without unduly restricting or expanding the statute's application or coverage. *Worley v. Weigels, Inc.,* 919 S.W.2d 589, 593 (Tenn. 1996).

The stated purpose of the Industrial Loan and Thrift Act is to provide the people of Tennessee the "facilities and resources of regulated lending institutions to meet their needs for loans at rates and charges reasonably commensurate with economic realities." *See* Tenn. Code Ann. § 45-5-101(a) (1993). All industrial loan and thrift companies desiring to do business in Tennessee must obtain a certificate of registration from the Commissioner of Financial Institutions for each one of their proposed branch offices. *See* Tenn. Code Ann. § 45-5-103 (1993). In order to qualify for a certificate of registration, an applicant must "demonstrate such experience, character and general fitness as to command the confidence of the public and warrant the belief that the business to be operated thereunder will be operated lawfully and fairly." *See* Tenn. Code Ann. § 45-5-201(a)(1).

A company that obtains a certificate of registration under the Industrial Loan and Thrift Act does not have a right to then operate perpetually. Tenn. Code Ann. § 45-5-205(a)(2) (1993) empowers the Commissioner of Financial Institutions to revoke a certificate of registration if the registrant has knowingly and without exercising due care "[v]iolated any provision of this chapter or any rule or regulation issued under this chapter."

Tenn. Code Ann. § 45-5-201(a) and Tenn. Code Ann. § 45-5-205(a)(2) are part of the same statutory scheme and, therefore, should be construed together, *see In re Gant,* 937 S.W.2d 842, 845 (Tenn. 1996); *State v. Blouvett,* 904 S.W.2d 111, 113 (Tenn. 1995), in order to promote consistency and uniformity, *see State ex rel. Witcher v. Bilbrey,* 878 S.W.2d 567, 571 (Tenn. Ct. App. 1994), and to avoid placing statutes in conflict with each other. *See Holder v. Tennessee Judicial Selection Comm'n,* 937 S.W.2d 877, 883 (Tenn. 1996); *Cronin v. Howe,* 906 S.W.2d 910, 912 (Tenn. 1995). Since Tenn. Code Ann. § 45-5-205(a)(2) empowers the Commissioner to revoke certificates of registration for "any provision of this chapter," the Commissioner has the authority to revoke the certificate of any registrant that does not satisfy the "experience, character, and general fitness" requirement in Tenn. Code Ann. § 45-5-201(a)(1). Any other interpretation would undermine the Department's ability to protect the public and would render the Commissioner's enforcement authority meaningless. Accordingly, the trial court erred when it found that the Department could not use Tenn. Code Ann. § 45-5-201(a)(1) as a basis to revoke the certificates of registration for National Loans' three branch offices in Tennessee.

## IV.
### EVIDENTIARY SUPPORT FOR THE REVOCATION ORDER

The remaining issue is whether the administrative record contains substantial and material evidence supporting the decision to revoke the certificates of registration for each of National Loans' branch offices in Tennessee. We have determined that the trial court erred by reversing the revocation of the Milan branch office's certificate of registration and that the record contains substantial and material evidence supporting the revocation of all three of National Loans' branch offices in Tennessee.

Our review of the Commissioner's revocation order is governed by the Uniform Administrative Procedures Act. Tenn. Code Ann. § 4-5-322(h)(5) (Supp. 1996) directs us to modify or reverse a final order if it is "unsupported by evidence which is both substantive and material in light of entire record." This standard of review does not contemplate that we will reweigh the evidence, *McClellan v.*

*Board of Regents,* 921 S.W.2d 684, 693 (Tenn. 1996), or that we will substitute our judgment concerning the weight of the evidence for the administrative agency's. *Sanifill of Tenn., Inc., v. Tennessee Solid Waste Disposal Control Bd.,* 907 S.W.2d 807, 810 (Tenn. 1995). It does, however, require us to review the record to determine whether the agency's decision is based on the sort of relevant evidence that a reasonable person might accept to support a rational conclusion or to furnish a reasonably sound basis for the action under consideration. *Clay County Manor, Inc. v. State,* 849 S.W.2d 755, 759 (Tenn. 1993); *Southern Ry. Co. v. State Bd. of Equalization,* 682 S.W.2d 196, 199 (Tenn. 1984).

The record contains substantial and material evidence that National Loans had a company-wide policy to charge more fees for real estate loans than permitted by the Industrial Loan and Thrift Act and that all three of its Tennessee branch offices collected fees in violation of Tenn. Code Ann. § 45-5-403(1)(B). The administrative law judge found National Loans' elaborate justifications for its conduct not worthy of belief. We give great weight to this determination, 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 11.2, at 183-84 (3d ed. 1994); 2 Charles H. Koch, *Administrative Law and Practice* § 9.16 at 204 (Supp. 1997), because determining the credibility of witnesses is within the province of the administrative finder of fact. 1 Charles H. Koch, *Administrative Law and Practice* § 6.54A, at 290 (Supp. 1997). Like the administrative law judge, the Commissioner, and the trial court, we place little credibility in National Loans' protestations that it was not aware of the fee limitations in the Industrial Loan and Thrift Act.[8]

In a similar fashion, the record contains substantial and material evidence that National Loans had a company-wide policy to misappropriate the proceeds of joint credit life insurance policies by forging endorsements on checks payable to its customers' estates. Two of National Loans' branch offices in Tennessee engaged in this practice. The record contains no evidence that National Loans'

---

[8]We need not rely on the presumption that persons in a regulated business are aware of the applicable regulatory statutes and regulations. One of National Loans' branch managers read Tenn. Code Ann. § 45-5-403(1)(B) to a corporate executive who informed her that National Loans had chosen to "interpret" the law differently. In addition, the company was sufficiently aware of Tenn. Code Ann. § 45-5-403 to understand that the maximum service fee in Tennessee was 4%, while the maximum fee in Mississippi was only 2%.

branch office in Milan did not follow company policy. Direct evidence of the Milan branch office's conduct was unavailable because the office did not maintain the records that would have enabled the Department to determine whether the practice took place.

The record shows by clear and convincing evidence that National Loans, as a matter of corporate policy, knowingly engaged in practices that were neither lawful nor fair. These practices were not isolated mistakes, but rather were carefully calculated to enable National Loans to collect more fees than permitted by the Industrial Loan and Thrift Act. The magnitude of National Loans' conduct is sufficient to undermine the public's confidence that the company was operating its business lawfully and fairly. Accordingly, the Department had sufficient factual and legal grounds to revoke the certificates of registration of all three of National Loans' branch offices in Tennessee.

## V.

We affirm the revocation of the certificates of registration of National Loans' Jackson and Collierville branch offices. In addition, we reverse the trial court's reversal of the administrative revocation of the Milan branch office's certificate of registration and remand the case for the entry of an order affirming the revocation of the certificate of registration of National Loans' Milan office. We also tax the costs of this appeal to National Loans, Inc. and its surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
HENRY F. TODD, P.J., M.S.


_____
SAMUEL L. LEWIS, JUDGE