**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Heriberto NAVARRO–CAMACHO,**
**Defendant–Appellant.**

**No. 97–3584.**

United States Court of Appeals,
Sixth Circuit.

Argued: Dec. 8, 1998.

Decided and Filed: Aug. 6, 1999.

Thomas O. Secor, Assistant U.S. Attorney (argued and briefed), Toledo, Ohio, for Plaintiff–Appellee.

Ralph E. Meczyk (argued and briefed), Chicago, Illinois, for Defendant–Appellant.

Before: WELLFORD, BOGGS, and MOORE, Circuit Judges.

BOGGS, J., delivered the opinion of the court. WELLFORD, J. (pp. 709–11), delivered a separate concurring opinion. MOORE, J. (pp. 711–12), delivered a separate opinion concurring in the result.

## OPINION

BOGGS, Circuit Judge.

Heriberto Navarro–Camacho appeals his conviction for drug trafficking, contending that the trial court erred in denying his

motion to suppress. Navarro–Camacho alleges, inter alia, that members of the Ohio Highway Patrol rubbed "pseudo-cocaine" on his vehicle in order to induce a drug detection dog to alert and, thus, provide the officers with phony probable cause to search the vehicle. We hold that the district court did not err in denying the motion to suppress and thus affirm defendant's conviction.

## I

On September 29, 1995, the Ohio Highway Patrol ("OHP") received an tip indicating that defendant-appellant Heriberto Navarro–Camacho ("Navarro"), possibly in the company of others, would be transporting five or more kilograms of cocaine to the Toledo area. Navarro was said to be driving either a blue or silver Chevrolet Suburban or a Ford Contour. The suspect vehicle was to have Illinois license plates.

Based on this information, OHP troopers Robert Stevens and Kevin Kiefer (in separate vehicles) staked out the eastbound stretch of the Ohio Turnpike just east of the Ohio–Indiana border beginning at 6 a.m. on September 30, 1995. Stevens had a narcotics dog with him in his vehicle. After nearly seven hours of unfruitful surveillance, the troopers began to drive back towards OHP headquarters in Toledo.

Shortly after 1 p.m., while driving eastbound in the direction of Toledo, Kiefer was informed by OHP trooper Robert Baranowski that a blue Chevy Suburban matching the description in the tip was driving eastbound on the Turnpike. Baranowski began to follow the Suburban, then turned into a crossover and proceeded in the other direction, because he "wanted the vehicle to not think [he was] following him anymore . . . ."

Kiefer, who had turned around and was now driving westbound, pulled off the Turnpike approximately sixteen miles before the Ohio–Indiana border in a 65 mile-per-hour speed limit zone. He spotted the suspect vehicle, activated his radar, and clocked the vehicle's speed at 68 miles per hour. Upon getting the reading, Kiefer activated his overhead lights, which also turned on his in-car video camera.[1] He followed the suspect vehicle, which contained Navarro (who was the driver) and two passengers. Kiefer pulled the vehicle over and approached the car on its passenger side. Baranowski and Stevens quickly arrived on the scene in their separate cars as Kiefer began conversing with the vehicle's occupants.

As Kiefer was engaging the vehicle's occupants in conversation, Stevens and Baranowski were near the rear of the car. Stevens then moved away from defendant's car and towards the cruiser with the mounted video camera. While moving, Stevens, with his back turned to Baranowski, made a sort of backwards hand gesture to Baranowski. The government claims that this was a "low-five" hand slap between the troopers. Navarro suspects that this may have been an exchange of "pseudo-cocaine" between the troopers. Pseudo-cocaine is a special cocaine isomer that the police apparently sometimes use to train drug dogs. *See People v. Hollingsead*, 210 Ill.App.3d 750, 155 Ill.Dec. 216, 569 N.E.2d 216, 219 (Ill.App.1991); *United States v. Bockius*, 564 F.2d 1193, 1195 n. 2 (5th Cir.1977).

After making this gesture, Stevens went to his cruiser to retrieve Dingo, his narcotics dog, while Baranowski stood next to the driver's door of the Suburban, conversing with Navarro. Stevens then brought Dingo around the vehicle; the dog alerted to the presence of narcotics near the driver's door of the Suburban, at approximately where Baranowski had been standing. The officers then executed a search of the vehicle, recovering five kilograms of cocaine in a duffel bag on the back seat.

Navarro filed a motion to suppress the evidence, arguing in his motion that there was no probable cause to search the vehi-

---

1. All of the subsequent events on September 30, 1995 are recorded on videotape.

cle because Dingo, the narcotics dog, was not reliable. A hearing on the motion to suppress was held before a magistrate judge on March 27–28 and June 18–20, 1996, during which the magistrate judge heard from thirteen witnesses who generated 742 transcript pages of testimony. At the hearing, Navarro attempted to establish not only that Dingo was not a reliable narcotics dog, but also that (1) he was illegally stopped because he was not exceeding the speed limit, and (2) the videotape made of the stop showed Stevens passing an object to Baranowski, which may have been "pseudo-cocaine" that Baranowski may have smeared on the car in order to get Dingo to alert.

Navarro testified that he was driving "a little under 65 miles-an-hour before [he] was stopped, because [he] set the cruise control" at 62 miles per hour soon after crossing the Ohio–Indiana border. Trooper Kiefer testified, however, that he clocked Navarro at 68 miles per hour, and that he had the calibration of his radar gun checked the morning of Navarro's arrest.

Navarro called Daniel Craig, an experimental psychiatrist and veterinarian who specializes in studying the behavior of narcotics dogs, as a witness at the hearing. Craig testified that Dingo was not a reliable drug-detecting canine. He based this assertion on his finding that there were "very severe gaps in [Dingo's] training records, and in [Dingo's] utilization records, the animal [was] responding to items that [he] has not been trained on." Craig, however, admitted that Dingo's certification records were incomplete, and his opinion was based on the incomplete records. He also testified that, under the protocol for training narcotics detection dogs for the Air Force developed by Craig, a dog "is functional at certification standards" of "90 percent."

· Stevens testified that Dingo was certified in 1990; that Dingo has passed his recertification every two years; and that he had trained with Dingo for between 1500 and 2000 hours. He also indicated

that, although Dingo occasionally alerted falsely, his rate of reliability was between 90 and 97 percent.

Navarro also called Dr. Bobby Hunt, an expert witness in the field of optics and applied mathematics, who testified that the videotape showed that an object was indeed passed from Stevens to Baranowski. FBI Agent Thomas Forgas, a photographic specialist, testified for the government that the videotape did not show the passing of an object but, rather, was simply the reflection of sunlight off of Stevens's hand. Troopers Baranowski and Stevens testified that the videotape simply depicted Stevens giving Baranowski a "low five."

The magistrate judge denied the motion to suppress, finding that:

- Kiefer's testimony about Navarro's speeding was credible and Navarro's claim that he was driving at 62 miles per hour was "unpersuasive," and, thus, the initial stop was justified.

- Dingo was a reliable canine detection dog in light of, *inter alia*, "the testimony of Dr. Craig that canine detection dogs are not infallible and Trooper Stevens's testimony that Dingo's accuracy rate was between 90% and 97%...."

- Though he was "unable to resolve the dispute based upon the expert testimony presented," and gave equal weight to the testimony of the two experts, the officers' testimony about the "low-five" was credible and, thus, Navarro's argument about police misconduct was unconvincing.

The district court reviewed the magistrate judge's report and (1) made a de novo determination that Trooper Kiefer had probable cause for the stop; (2) adopted the magistrate's findings of fact as they related to Dingo and ruled de novo that Dingo was a reliable narcotics dog; and (3) found that the troopers did not transfer or plant a substance on Navarro's vehicle. After making a de novo determination that the search of the vehicle was

legal, the district court adopted the magistrate judge's report in all respects. It then denied the motion to suppress.

Navarro subsequently entered a conditional guilty plea pursuant to FED. R. CRIM P. 11(a)(2). He now appeals.

## II

### A. The motion to suppress

 Factual findings made in consideration of a motion to suppress are reviewed for clear error, while the conclusions of law are reviewed de novo. *United States v. Ursery*, 109 F.3d 1129, 1132 (6th Cir.1997). A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993). The evidence is reviewed "in the light most likely to support the district court's decision." *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir.), *cert. denied*, 513 U.S. 907, 115 S.Ct. 274, 130 L.Ed.2d 191 (1994).

### 1. Initial stop of Navarro's vehicle

 Navarro first contends that Kiefer did not have probable cause to stop his vehicle. Kiefer testified that he clocked Navarro with his radar at a speed of 68 miles per hour. The magistrate judge found Kiefer's testimony credible, the district court adopted the magistrate judge's report, and this court accords great deference to such credibility determinations. *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir.1990). Navarro points to nothing to persuade this court that the district court and magistrate judge erred in crediting Kiefer's testimony over his testimony, notwithstanding his suggestion that it would have defied common sense

for him to speed while carrying cocaine. Navarro's suggestion appears to somewhat echo Circuit Judge Edgerton in *Higgins v. United States*, 209 F.2d 819, 820 (D.C.Cir. 1954), where Judge Edgerton questioned whether there could ever be consent to a search that actually finds contraband, contending that "no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered." However, as the government notes in its brief, "[C]ase law in this circuit ... is replete with instances of drug couriers disobeying traffic laws while transporting illegal substances."

 Moreover, the Supreme Court recently ruled in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), that prior Court precedent

> foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

*Id.* at 813, 116 S.Ct. 1769. Therefore, since generally "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," *id.* at 810, 116 S.Ct. 1769, the stop of Navarro's vehicle was proper.[2]

Navarro called three witnesses at the hearing in an attempt to establish "that Stevens used Dingo as a device to get into and search any vehicle he chose to stop,

---

**2.** Navarro has attempted to introduce evidence from an unrelated civil suit to establish that Kiefer targeted Navarro because of his race. Not only did the district court properly find this evidence to be inadmissible, but

*Whren* clearly indicates that the evidence would be irrelevant for the purpose of determining whether Kiefer's stop of the vehicle violated Navarro's Fourth Amendment rights.

usually those operated by Hispanics." However, Trooper Kiefer (who stopped Navarro) was not involved in any of the stops described by these witnesses and, moreover, there is no properly-admitted evidence in the record that would indicate that there is any degree of selective enforcement of speeding laws by the OHP based on racial considerations.

### 2. Reliability of Dingo

Navarro next claims that the troopers did not have probable cause to search his vehicle because Dingo, the narcotics dog that alerted to the presence of cocaine, was unreliable. A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance. *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir.1994). The Diaz court further explained:

> When the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability. As with the admissibility of evidence generally, the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sound discretion.

*Id.* at 394.

The *Diaz* court noted that "[c]ourts have not definitively addressed the issue of the quality or quantity of evidence necessary to establish a drug detection dog's training and reliability." *Id.* The magistrate and district court found that Dingo, as a factual matter, was reliable. When reviewing the denial of a motion to suppress evidence, this court reviews the district court's findings of fact only for clear error. *See Unit-*

*ed States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir.1996), *cert. denied*, 520 U.S. 1178, 117 S.Ct. 1453, 137 L.Ed.2d 558 (1997).

The district court's determination that Dingo was reliable was not clearly erroneous. Trooper Stevens testified that Dingo was certified in 1990; that Dingo has passed his recertification every two years; and that he had trained with Dingo for between 1500 and 2000 hours. Stevens also stated that, although Dingo occasionally alerted falsely, his rate of reliability was between 90 and 97 percent. Navarro's own expert indicated that, under the training protocol the expert had designed, a dog "is functional at certification standards" of "90 percent." On these facts, the district court's finding of reliability was not clearly erroneous.

### 3. The videotape and alleged "pseudo-cocaine"

Navarro claims that shortly after the stop of his Suburban, Trooper Stevens passed a package containing "pseudo-cocaine" to Trooper Baranowski, who smeared the package near the driver's door so that when Stevens walked Dingo around the vehicle, the dog would alert on the odor. The district court found that the troopers did not transfer or plant a pseudo-cocaine substance on Navarro's vehicle. This finding was "[b]ased on the totality of the evidence," including testimony from expert witnesses and the troopers (who claimed they did no such thing). When reviewing the denial of a motion to suppress evidence, this court reviews the district court's findings of fact only for clear error. *See Bradshaw*, 102 F.3d at 209.

The magistrate judge and district court weighed the testimony of the experts and troopers, along with the admitted videotape, and came to the conclusion that the troopers did not behave as Navarro alleges. This finding of fact was not clearly erroneous. Admittedly, the encounter between Stevens and Baranowski, as depicted on the videotape, looks unnatural and

may be subject to conflicting interpretations. However, the district court conducted a full and complete evidentiary hearing to determine whether "pseudo-cocaine" was exchanged between Troopers Stevens and Baranowski and whether Baranowski rubbed that substance on Navarro's vehicle to get Dingo to falsely alert.

This court has been able to review the videotape made of the stop of Navarro's vehicle. However, the simple fact that we have been able to evaluate this key piece of evidence on direct review does not change the fact that we review the district court's findings of fact for *clear error.* The magistrate judge was able not only to view the videotape, but also to hear from an array of witnesses who testified about either (1) the videotape itself or (2) the events depicted on it. The magistrate judge did not render her decision simply by viewing the videotape; in fact, she made it clear that her factual finding that none of the alleged wrongdoing took place was based in large part on the testimony of the officers, *whom she found credible.*[3] Where, as here, factual findings rest in large part on credibility determinations, we afford district courts even greater deference. *See Cooke,* 915 F.2d at 252.

We simply do not believe that the magistrate judge's finding of fact (adopted by the district court) that the troopers did not transfer or plant a pseudo-cocaine substance on Navarro's vehicle was clearly erroneous. At the outset, Navarro's contention that, if the troopers indeed intended to illegally "find" probable cause, that

they would do so by waiting until they were *in front of a video camera,* seems strained. Moreover, an independent review of the videotape does not give us a settled feeling that the fleeting interaction between Stevens and Baranowski was the transfer of any object, yet alone a package of pseudo-cocaine. We also note that, even assuming *arguendo* that he could establish that an object was passed between the troopers, Navarro does not even attempt to show that (1) the object had an odor that would cause Dingo to alert, or (2) that the object was smeared on the car.

In his briefs and at oral argument, Navarro's able counsel has constructed a narrative that has at least a possibility of being true. Navarro believes that criminal police officers repeatedly follow a policy in which they deliberately stop Hispanic motorists on trumped-up charges, exchange in full view of a police video camera a substance designed to cause a drug dog to alert, apply the substance to a motorist's car, and then either allow a drug dog to alert to the substance, or simply invade the interior of the car so that the dog can more easily alert to the multi-kilogram quantities of drugs suspected to be therein. However, we must emphasize that the alternative scenario also could be true. Drug runners speed; police stop them for speeding; and a drug dog alerts to large quantities of drugs.

■ In such a circumstance, as an appellate court, we do not reweigh the evi-

---

3. Navarro attempts to call the officers' credibility into question by claiming that Kiefer and Baranowski testified that the tip came from the DEA (it in fact came from the Michigan State Police). However, neither Baranowski nor Kiefer testified to this effect. In fact, Stevens was the only person who testified that his informational source was the DEA. During cross-examination, Stevens was asked, "You didn't know who the source of the tip was except the DEA, correct?" Stevens responded, "Yes."

This response by Stevens, however, in no way stands for the proposition that the *ultimate source* for the tip was the DEA. At best,

it only stands for the proposition that Stevens *obtained* the information from the DEA. In fact, the head of the DEA task force operating in northwestern Ohio testified that he could not rule out the possibility that someone from his agency may have independently contacted officers with information about Navarro. This seems a very real possibility, considering the fact that the stakeout by Kiefer and Baranowski was an OHP–DEA "joint operation." Needless to say, Navarro's implication that this is a contradiction in testimony that calls into question the officers' credibility is very weak.

dence presented below for the purpose of determining which scenario has the greater possibility of being true. The job of weighing the evidence belongs to the trial court, which in this case exhaustively carried out its proper function. The magistrate judge heard from thirteen witnesses during the course of a five-day-long hearing. These thirteen witnesses generated 742 transcript pages of testimony. In denying the motion to suppress, the magistrate judge took into account the credibility determinations she was entitled to make, as well as the testimony of expert witnesses. Our only role is to determine if the magistrate judge's ultimate conclusions, as reviewed and confirmed by the district court, were clearly erroneous. We see no basis for overturning a decision of the factfinders in this case, whichever way they decided. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

Moreover, Occam's Razor also supports the magistrate judge's decision. The conspiratorial theory offered by Navarro simply does not make much sense. Navarro would have us believe that Stevens passed pseudo-cocaine to Baranowski (which Baranowski then rubbed on the car), went back to his vehicle to get Dingo, and walked Dingo around the car. According to Navarro's theory, Dingo then alerted to the exact spot where the pseudo-cocaine was applied by Baranowski. This theory begs a simple question: *why would Stevens have risked passing the pseudo-cocaine on to Baranowski when he simply could have applied the substance to the car himself?*[4]

Navarro offers us two potential answers to this question, neither of which is particularly convincing. He first contends that if Stevens had applied the substance to the vehicle himself, Stevens would not have been able to control the location and timing of Dingo's alert because Dingo may have mistakenly alerted to Stevens (who would have been exposed to the odor of the substance). This explanation makes no sense, because Stevens would have obviously had the substance on his person *before* the alleged exchange with Baranowski. The videotape shows that Stevens walked around for approximately one minute (with, if Navarro is correct, pseudo-cocaine in his possession) before allegedly passing something on to his fellow trooper. If Navarro's explanation for the passage were correct, Stevens would have become "coated" with the odor of pseudo-cocaine, *whether he passed the substance on to Baranowski or not.*

Navarro's second explanation is that the exchange was necessary because, if Stevens applied the pseudo-cocaine himself, the odor of the substance would dissipate in the time it took Stevens to go back to get his dog and walk it around the car. However, the videotape shows that approximately forty seconds took place between the moment when Baranowski would have allegedly rubbed the substance on the car and the instant Dingo alerted.[5]

---

**4.** For that matter, Stevens could also more easily have passed Baranowski any pseudo-cocaine when the two were out of sight of the video camera, or could have instead conspired with Kiefer, during the seven hours they were together, to do the deed.

**5.** Baranowski only left the side of Navarro's car a few seconds before Dingo alerted. However, Baranowski *was talking to Navarro* for much of the time he was standing beside the driver's door. In fact, Baranowski appears to have been engaging Navarro in conversation right up until the time he moved away from the vehicle to allow Dingo to sniff the door. Since Baranowski obviously would not have rubbed pseudo-cocaine on Navarro's driver's door during a time he had commanded Navarro's undivided attention by engaging him in conversation, Baranowski could have only rubbed a substance on the door in the few seconds before he had started talking to Navarro. Approximately forty seconds passed between this window of opportunity and the time Dingo alerted.

Indeed, Stevens walked Dingo around two-thirds of the car's perimeter before he arrived at the spot where Baranowski had allegedly rubbed the pseudo-cocaine. If Stevens had been so concerned about the substance's rate of dissipation, one wonders why he wouldn't have taken Dingo *directly* to the spot where Baranowski had rubbed the pseudo-cocaine. We also note that Navarro has not introduced one shred of evidence about the dissipation rate of pseudo-cocaine.

Navarro also asserts in his brief that "too many objective factors recommend that, not only did the officers fabricate the basis for the stop, but they manufactured the probable cause necessary to subsequently search the vehicle, all to retroactively justify seizing a significant quantity of narcotics." In other words, Navarro is implying that if he alleges that numerous findings of fact made by the court were in error, the cumulative impact of these asserted errors may somehow constitute reversible error, even if each individual questioned finding does not. This is not the case, for Navarro's assertion ignores the fact that many of the alleged errant findings he cites are mutually exclusive. For example, if the officers did smear pseudo-cocaine on Navarro's vehicle, that would imply that, at least in this case, Dingo alerted properly. Moreover, if Trooper Stevens indeed had a practice of shoving Dingo into vehicles in order to get the dog to provide a "false" alert and, therefore, probable cause (as one of Navarro's witnesses claimed), this would imply that the pseudo-cocaine theory is untrue (why would Stevens and Baranowski have gone to all this trouble when Stevens could have just shoved Dingo into Navarro's car?).

The fact that Baranowski was standing next to the driver's door of the Suburban also calls Navarro's theory into question in another way: would a police officer really have taken the risk of rubbing pseudo-cocaine near the driver's door of a vehicle when the driver was sitting in the front seat? After all, if Baranowski had somehow inadvertently attracted

In sum, the district court's denial of the motion to suppress was proper.

### B. "Meaningful review"

Although the district judge made it explicitly clear that he was conducting a de novo review of the portions of the magistrate's report to which Navarro had objected, Navarro nonetheless makes the claim that the district court's review was not "meaningful" and, thus, violated his right to due process. Without citing any relevant case law, Navarro opines that "the district court exerted no effort to actually give the case the attention it required."

Navarro's argument is meritless. He presents absolutely no evidence showing that the district court exerted "no effort," yet still makes the outlandish accusation that "the district court dismissed the spirit of the notion [of de novo review] by resolving all factual disputes in ˙favor of the government...."

### III

For the foregoing reasons, we AFFIRM the denial of Navarro's motion to suppress and, therefore, AFFIRM his conviction.

WELLFORD, Circuit Judge, concurring.

I am persuaded by our standard of review in this kind of case, which is heavily dependent on factual and credibility findings by the magistrate judge and the district court, that we should affirm.

˙ This case is troubling—necessarily so by reason of defendant's challenges to the integrity and good faith of the state troopers in effectuating the stop of the vehicle, and the subsequent search and seizure of a substantial quantity of contraband found in

Navarro's attention while he was allegedly smearing pseudo-cocaine on the car, he likely would have been "caught" by Navarro! One would think that a dishonest police officer would apply pseudo-cocaine to the portion of a vehicle where the officer would be least likely to be "caught" applying the substance.

defendant's vehicle. Like the other judges who have been involved in the trial and in this appeal, I have read the record carefully, and I have reviewed the tape of the happenings during the traffic stop.

It is well-settled that when reviewing the district court's factual findings, we must "consider the evidence in the light most favorable to the government." *United States v. Caicedo*, 85 F.3d 1184, 1188 (6th Cir.1996); *see also United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995). If one were to ignore this standard in this difficult case, there would be a temptation to arrive at the different result urged upon us by defendant. We, however, must follow the law.

The defendant and his witnesses took issue with the testimony of the trooper who clocked the vehicle in question as exceeding the lawful speed limit, as well as the alleged tip which alerted the troopers to the particular type of vehicle that purportedly was transporting drugs. Furthermore, the defendant contested the circumstances described by the troopers prior to the stop, and, most vehemently, the circumstances involved in the use of the trained drug-sniffing canine, Dingo. Moreover, there was some controversy about what happened between troopers Stevens and Baranowski as portrayed on the video tape, and whether they singled out Latinos like the defendant for traffic stops and drug searches. A trier of fact might sincerely and honestly reach different conclusions based on divergent factual determinations in respect to these (and other) controversies mentioned in this case.

Viewing the evidence in a light most favorable to the government's proof as determined by the factual findings of the magistrate judge and the district judge, I conclude that we should affirm. Expert proof was developed in this case which was conflicting as to both the capabilities of Dingo, the canine, which alerted to the contraband in the vehicle, and what transpired on the video tape between the troopers as they approached the type of vehicle they had purportedly been looking for over a several hour stretch. Once again, it was for the trial judge to make the necessary credibility findings on the defendant's motion to suppress.

Judge Boggs, I believe, properly devoted some attention to the circumstances of the initial stop. It is important to point out, however, that the defendant in his appellate brief at p. 29, concedes that "[he] never challenged the pretextual nature of the stop." In any event, Trooper Kiefer testified that his radar unit had been calibrated earlier that day and was, in fact, accurate and working properly. There was inadequate proof that Trooper Kiefer was involved in any improper stops of Latinos. The Supreme Court has stated, unanimously, that "[s]ubjective motivations play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Thus, we do not probe into the officer's state of mind in making the traffic stop, but rather whether probable cause for the stop was demonstrated.

Despite the defendant's assertions to the contrary, there was substantial evidence admitted to support the proposition that Dingo was a reliable drug-detecting canine. First, Stevens and Dingo were certified in 1990. Thereafter, every two years, Dingo passed his recertification. During that time period, Stevens trained with his dog between 1500 and 2000 hours. Additionally, Stevens produced for the court numerous certificates, recertifications, and commendations which had been earned by Dingo for his reliability. The most recent recertification, prior to the sniff which occurred in this case, was approximately forty days before the event. Moreover, Stevens testified that since 1990, Dingo had alerted accurately between ninety and ninety-three percent of the time. Even Dr. Craig, the defendant's expert, agreed that a drug-detecting canine with a ninety percent accuracy rate should be considered

reliable. *See United States v. Berry*, 90 F.3d 148, 153 (6th Cir.1996). The district court's finding that Dingo was reliable was not clearly erroneous.

For all of the reasons stated by Judge Boggs and under the appropriate standard of review, I concur in the opinion that we shall AFFIRM.

MOORE, Circuit Judge, concurring in the result.

I am troubled by several aspects of this difficult case. First, I find the actions of Troopers Stevens and Baranowski, as recorded on video tape, to be very suspicious. However, because I cannot conclude that the district court clearly erred in denying Navarro's motion to suppress, I am compelled to concur in the result.

My second concern, and the reason for my separate writing, relates to the allegations of race and ethnicity targeting by the Ohio Highway Patrol ("OHP") and the handling of evidence of such targeting in this and similar cases. Navarro attempted to introduce evidence from an unrelated civil rights suit which alleges that Trooper Kiefer and other OHP officers have singled out Hispanic motorists for investigatory stops on the basis of minor or nonexistent traffic violations. The district court refused to consider this evidence, and, as Judge Boggs correctly points out, evidence of racial or ethnic targeting is not relevant to the determination of whether the troopers had probable cause to stop Navarro's vehicle. *See Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

Although under *Whren* an officer's motive in stopping a speeder is irrelevant for Fourth Amendment analysis, the selective enforcement of traffic laws based solely on race or ethnicity would violate the Equal Protection Clause of the Fourteenth Amendment. *See United States v. Avery*,

137 F.3d 343, 355 (6th Cir.1997). In a proper case, I believe that a defendant in Navarro's position could achieve suppression of the evidence or dismissal of the prosecution by demonstrating that the investigatory practice had a discriminatory purpose and a discriminatory effect. *See United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (discussing selective prosecution elements); *United States v. Jennings*, No. 91–5942, 1993 WL 5927, at *4, 985 F.2d 562 (6th Cir. Jan.13, 1993) (unpublished disposition) (suggesting suppression as remedy for seizure of evidence in violation of Equal Protection Clause); *Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir.) (noting that a "court should dismiss a case, or take other appropriate action" if defendant proves selective enforcement), *cert. denied*, 519 U.S. 928, 117 S.Ct. 296, 136 L.Ed.2d 215 (1996).[1]

In the instant case Navarro sought to introduce the complaint from an unrelated civil rights suit as evidence in support of his Fourth Amendment claims, not to demonstrate that he had been the victim of selective law enforcement in violation of the Equal Protection Clause. The complaint does not provide evidence of disparate treatment of Hispanic motorists, moreover, and thus would not be sufficient to establish an equal protection claim. *See Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480. A selective enforcement claim in Navarro's case would be weakened further by the undisputed evidence that the investigation of him resulted from a tip—a fact that undermines any assertion that he was stopped solely on the basis of his ethnicity. *See Avery*, 137 F.3d at 354 n. 5. For these reasons I conclude that the district court did not err in refusing to consider this evidence. The district courts should remain open, however, to the possibility of Fourteenth Amendment selective enforce-

---

**1.** Alternatively, a victim of selective enforcement could file a § 1983 action. *See Futer-* *nick,* 78 F.3d at 1056–57.

ment challenges in future criminal prosecutions.