NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0032n.06

Case No. 22-1573

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Jan 22, 2024

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| VONNELL ALANDO REED, | ) | |
| Defendant - Appellant. | ) | OPINION |
| | ) | |

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

GIBBONS, Circuit Judge. Vonnell Reed challenges his conviction for possessing a firearm while a convicted felon in violation of 18 U.S.C. § 922(g)(1). Reed claims that the district court erred in denying his motion to suppress and that he was deprived of his statutory and constitutional rights to a speedy trial. Finding no basis to disturb the district court's judgment, we affirm.

I.

A.

In the late evening hours of April 4, 2019, Detroit Police Department Sergeant Harold Lewis and Officers Michael Reyes and Gibron Lockhart were together on patrol in Detroit's northwestern corner near Seven Mile Road. Approaching a stoplight, they observed a black SUV lacking a visible license plate. The officers agreed to initiate a traffic stop, and Lewis, who was driving, followed the SUV, activating the cruiser's lights. The SUV pulled over, and Lewis, Reyes and Lockhart exited the cruiser, approaching the SUV on foot.

The officers flanked the vehicle, with Lewis approaching from the driver's side, Reyes approaching from the passenger side, and Lockhart approaching from the rear. As they advanced, Reyes and Lockhart directed their flashlights through the SUV's tinted windows, and both officers observed the driver — whom they would later identify as defendant Vonnell Reed — turn towards the center console and toss an object into the SUV's backseat. Reyes then "heard a thump on the back right side door," DE 68, Suppression Hr'g Tr. Vol. II, Page ID 324, and Lockhart similarly heard "a clunk sound . . . like a metal object hitting the floorboard," *id.* at 307. Both officers suspected a firearm, and Reyes leaned towards Lockhart to "let him know that [he] had seen a pistol and . . . needed [Lockhart] to unlock the doors." *Id.* at 328.

Lockhart then veered left and joined Sergeant Lewis at the front driver's side door. After unlocking the SUV's doors to allow Reyes access to the backseat, Lockhart assisted Lewis in removing Reed from the vehicle. Upon speaking with Reed, Lewis and Lockhart learned that Reed possessed neither a valid driver's license nor a Michigan concealed pistol license. The pair handcuffed Reed and walked him back to the cruiser.

Meanwhile, Reyes opened the rear passenger door and searched the SUV's floorboard. There, he recovered a 9mm Hi-Point pistol with seven live rounds loaded in the magazine. The officers then placed Reed under arrest for carrying a concealed weapon in a motor vehicle, in violation of Mich. Comp. L. § 750.227(2).

B.

Subsequent investigation revealed Reed's four prior felony convictions, and on April 23, 2019, a federal grand jury returned a one-count indictment charging Reed with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Reed pled not guilty, and he remained in federal custody pending trial.

The district court set a trial date of June 17, 2019, but Reed's trial did not take place for another three years. Between April 2019 and March 2020, a series of agreed continuances, in part owing to back-to-back substitutions of Reed's court-appointed counsel, repeatedly delayed Reed's trial date. Then, the COVID-19 pandemic and the district court's related precautions, together with Reed's pretrial motions and subsequent attempts to replace his attorney yet again, delayed Reed's trial until March 2022.

During this three-year interval, Reed litigated two issues relevant to his current appeal. First, Reed moved to suppress the firearm that Reyes recovered from the backseat of his SUV, arguing that the search violated his Fourth Amendment rights. The district court denied the motion, concluding that Lockhart's and Reyes's visual and auditory observations — to which they credibly testified at the suppression hearing — provided them with reasonable suspicion to conduct a protective search of Reed's vehicle.

Second, Reed urged denial of the government's October 2021 motion to adjourn trial, as further delay would violate his constitutional and statutory rights to a speedy trial. The district court disagreed and granted the government's motion. Because the bulk of the delay up to that point owed to Reed's motions, pandemic-related precautions, or a confluence of the two, the court concluded that further continuance would not violate Reed's Sixth Amendment or Speedy Trial Act rights.

Representing himself, Reed ultimately went to trial in March 2022. The jury found Reed guilty, and the district court sentenced him to seventy-one months' imprisonment. Reed now appeals his conviction, arguing that the district court erred in denying his motion to suppress and that the delays violated his speedy trial rights under the Sixth Amendment and Speedy Trial Act.

II.

A.

We begin with Reed's motion to suppress. Reed contends that the district court should have excluded the 9mm Hi-Point pistol and its accompanying ammunition from the evidence at trial because Reyes discovered the pistol during an unconstitutional search of Reed's vehicle. To that end, Reed makes a predominantly factual argument, claiming that the district court erred in deeming Lockhart and Reyes credible and thus erred in accepting their version of events. Without the officers' testimony, Reed surmises, the district court lacked a basis to conclude that Reyes's search of Reed's vehicle was constitutionally sound. And without a constitutional justification for the search, Reed concludes, the firearm that Reyes recovered should have been suppressed.[1]

We review the district court's factual findings, including its credibility determinations, for clear error. *United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023). District courts are typically "in the best position to judge credibility," *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), and we therefore lend their credibility findings "great deference," *United States v. Navarro-*

---

[1] Reed appears to concede, by negative inference, that if the district court did not factually err in deeming the officers credible, then its legal analysis under the Fourth Amendment is sound. *See* CA6 R. 39, Appellant Br., at 28 ("Without credible testimony from the officers, there is no evidence that substantiates reasonable suspicion to extend the traffic stop to include a search of [Reed's] vehicle."). But even if the foregoing is not a concession, Reed advances no standalone legal argument independent of his factual challenge. We therefore find that Reed has forfeited any such argument. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'" (quoting *Golden v. Comm'r Internal Revenue*, 548 F.3d 487, 493 (6th Cir. 2008))); *see also United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997))). Indeed, a contrary finding would require us to supply Reed's Fourth Amendment argument for him, a practice settled appellate principles caution against. *See United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016) ("A party may not raise an issue on appeal by mentioning it in the most skeletal way, leaving the court to put flesh on its bones." (cleaned up) (quoting *Robinson*, 390 F.3d at 886)).

*Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). We yield to the district court in this context unless our review of "the entire evidence" leaves us "with the definite and firm conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (quoting *Navarro-Camacho*, 186 F.3d at 705). And because the district court denied Reed's motion to suppress, we view the evidence in the light most favorable to the government. *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000). If the district court chose between "two permissible views of the evidence," we will not find clear error. *United States v. Campbell*, 486 F.3d 949, 953 (6th Cir. 2007).

After hearing testimony from Lockhart and Reyes and viewing the dashboard and body-worn camera footage, the district court deemed the officers credible and accepted their version of events, finding that the officers (1) stopped Reed for driving without a license plate, (2) observed Reed toss a firearm-shaped object towards the backseat, (3) heard the suspected firearm land with a loud noise, and then, upon opening the rear passenger door, (4) found Reed's loaded pistol lying on the vehicle's floorboard. Although Reed testified to a different version of events, the district court found his testimony unpersuasive, stating that it "added nothing to support the invalidity of the stop and search." DE 57, Op. & Order Denying Mot. to Suppress, Page ID 182. Reed now challenges the district court's credibility finding based on four supposed weaknesses in the officers' story.

To begin, Reed argues that the officers were predisposed to detect evidence of a weapon because Lockhart was, at the time of the stop, participating in a special operations unit tasked with "get[ting] guns off the street." DE 67, Suppression Hr'g Tr. Vol. I, Page ID 271. Reed claims the officers searched his vehicle based on this predisposition rather than their observations. But this contention cuts both ways, because if the officers indeed "anticipat[ed]" finding weapons, CA6 R.

39, Appellant Br., at 26, then they likely approached Reed's vehicle with heightened awareness and focus, which would bolster, rather than undercut, the reliability of their observations. *See United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (noting that an argument that presents the court with "two permissible views of the evidence" is an "insufficient basis upon which to reverse a district court's factual finding"). Even if Lockhart's participation in the special operations unit primed the officers to see a weapon (a wholly unsupported proposition), that fact would not meaningfully undermine the officers' credibility as to their reasons for the search.

Reed next argues that the officers could not have seen into his vehicle as they described because Reyes, upon cross-examination, could not identify his flashlight's beam among the multiple light sources that dashcam footage captured shining on Reed's SUV. But this argument is minimally probative as to the officers' credibility, for two reasons. First, Reyes's difficulty parsing the various sources of light shown in the dashcam footage tells us nothing about what activity within Reed's vehicle the dashcam footage does or does not depict. To put it another way, the line of cross-examination on which Reed relies is simply beside the point. Second, even if the dashcam footage failed to corroborate the officers' recollection of Reed's movements (a proposition that Reyes's cross-examination did not establish), that fact would still not necessarily undercut the officers' credibility. The dashcam footage captures a different view of Reed's SUV than the views Reyes and Lockhart possessed when they observed Reed toss a firearm-shaped object toward the SUV's backseat. Common sense tells us that what can be seen from distinct vantage points will often differ, and we should therefore expect that what Reyes and Lockhart saw when approaching Reed's vehicle differs from what can be seen in the dashcam footage, which was taken (1) from further away, (2) from below the officers' eye level, and (3) in Reyes's case, from a different angle relative to the vehicle. For both reasons, then, Reyes's difficulty parsing

the dashcam footage does not imply that the officers lied about their visual observations when approaching Reed's SUV.

Reed's third argument, which concerns the officers' auditory observations, proves similarly flawed. Reed contends that the officers could not have heard his pistol hitting the floorboard as they claimed because the sound "would have [been] significantly dampened" by a towel that Reyes's body camera footage shows was draped over the vehicle's passenger seat. CA6 R. 39, Appellant Br., at 27. But this is unfounded speculation. Both Reyes and Lockhart testified that they were familiar, by way of experience, with the sound a handgun makes when it lands on a hard surface. Reed makes no effort to refute that testimony. And the record contains no evidence, testimony or otherwise, to support the contention that a towel draped over a car seat would meaningfully dampen the sound of a metal firearm hitting the car's floorboard below. If Reyes had found the pistol lying on top of the towel, or if he had found the towel lying on the floorboard next to the pistol, then Reed could plausibly assert that the gun had landed on the towel, potentially muting any noise it made when hitting the floorboard. But neither Reyes's testimony nor his body-camera footage supports that hypothetical contention. The towel's presence in Reyes's body-camera footage thus did not give the district court any reason to disbelieve the officers' claims about what they heard.

Finally, Reed's assertion that the district court erred by failing to reconcile the inconsistency between his testimony (claiming that officers found the pistol in a seatback pocket) and that of the officers (claiming that they found the pistol on the vehicle's floorboard) is tautological. Credibility determinations are by their very nature contests between inconsistent versions of events. *See United States v. Ranson*, 419 F. App'x 633, 634 (6th Cir. 2011) (describing the district court's credibility finding as a choice "between competing accounts" of the facts).

The district court, weighing all the evidence before it, chooses to believe one version and disbelieve the other; once that credibility determination is made, the district court does not err by failing to square the inconsistent testimonies. Rather, the credibility finding is the squaring. *Id.* at 635 (again describing the district court's "ring-side credibility determination," *United States v. Kimbrel*, 532 F.3d 461, 468 (6th Cir. 2008), as the "difficult task [of] sifting through . . . competing stories"). Because the court found Reed's retelling lacked credibility, it did not need to explain how the facts described in the officers' testimony could co-exist with Reed's alternative facts; they simply could not.

In sum, our review of the record does not leave us with a "definite and firm conviction" that the district court erred in deeming Reyes and Lockhart credible. *Sanford*, 476 F.3d at 394 (quoting *Navarro-Camacho*, 186 F.3d at 705). Because there is no clear error in the district court's factual findings, we affirm its denial of Reed's motion to suppress.

B.

We next consider Reed's challenge to his conviction under the Sixth Amendment's Speedy Trial Clause. The principles that guide our analysis are well-settled under the standard set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). As a panel of this court recently stated,

> [r]ather than set a fixed time period, *Barker* selected a 'balancing test' that decides each speedy-trial claim on an 'ad hoc basis.' It identified four questions for courts to ask when confronted with such a claim: How long was the delay? What was the reason for it? Did the defendant timely assert this speedy-trial right? And what prejudice, if any, has the defendant suffered? To resolve the claim, a court must 'engage in a difficult and sensitive balancing' of these four factors along with any other 'relevant' circumstance.

*United States v. Allen*, 86 F.4th 295, 304 (6th Cir. 2023) (internal citations omitted) (quoting *Barker*, 407 U.S. at 530, 533). In determining whether Reed's right to a speedy trial was violated,

we review questions of law de novo and questions of fact for clear error. *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003).

Beginning with the first factor, the length of pretrial delay, our inquiry is twofold. First, as a threshold question, we ask whether the interval between Reed's arrest and trial surpassed that which is "ordinary" in criminal litigation and evolved into a "presumptively prejudicial" delay. *Doggett v. United States*, 505 U.S. 647, 652 (1992) (quoting *Barker*, 407 U.S. at 530–31). If the delay crossed the threshold into "presumptively prejudicial," then it triggers consideration of the remaining *Barker* factors. *Id.*; *see also Barker*, 407 U.S. at 530. If not, our examination of Reed's speedy trial claim ends. *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006). This court has held that "[a] delay approaching one year is presumptively prejudicial," *id.*, and here, the government concedes that the nearly three-year period intervening Reed's arrest and trial triggers a full *Barker* analysis. *See United States v. Ferreira*, 665 F.3d 701, 705 (6th Cir. 2011) (delay of "'nearly three years' . . . satisfies [*Barker*'s] threshold requirement" (quoting *United States v. Ferreira*, No. 1:05-CR-92-3, 2009 WL 311136, at *3 (E.D. Tenn. Feb. 6, 2009))).

Given the government's concession, we next "consider . . . the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. In this case, Reed's thirty-five-month wait for trial exceeds the time necessary to trigger a full *Barker* analysis by a wide margin, and the delay therefore weighs heavily in Reed's favor. *Id.* ("[T]he presumption that pretrial delay has prejudiced the accused intensifies over time."); *see also Allen*, 86 F.4th at 304 ("[T]he four-year holdup in this case looks more like the 'extraordinary' delay that the Court confronted in *Barker* than the 'customary' one that it hypothesized in *Doggett*." (first quoting *Barker*, 407 U.S. at 533; and then quoting *Doggett*, 505 U.S. at 652)).

Moving to the second *Barker* factor, we next examine the reasons underlying the delay, which are best understood as lying on a spectrum. *United States v. Flowers*, 476 F. App'x 55, 61 (6th Cir. 2012). At one end of the spectrum are delays contrived by the government to harass the defendant or hamstring his defense. *Robinson*, 455 F.3d at 607. Manufactured delays of this nature weigh heavily against the government. *Id.* In the middle of the spectrum lie "neutral reasons" such as governmental negligence or overcrowded courts, which still weigh against the government, but less so. *Id.*; *Barker*, 407 U.S. at 531. And at the other end of the spectrum lie legitimate delays, including those attributable to the accused or his counsel. *Robinson*, 455 F.3d at 607; *see also Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009) ("Because the attorney is the defendant's agent when acting, or failing to act, in furtherance of the litigation, delay caused by the defendant's counsel is also charged against the defendant." (cleaned up) (citing *Coleman v. Thompson*, 501 U.S. 722, 753 (1991))). When a valid reason — for example, an unavailable witness — delays trial, or when the defendant himself slows the proceedings by filing a pretrial motion or requesting new counsel, the delay "favors the government" and "undercut[s]" the defendant's speedy trial claim. *Allen*, 86 F.4th at 305.

Under the foregoing framework, the reasons for the three-year timeline to Reed's prosecution cut against his speedy trial claim. From April 2019 to March 2020, Reed triggered several delays in the district court's proceedings, twice moving to replace his court-appointed attorney and thrice moving to continue his trial date.[2] Reed also filed the above-discussed motion

---

[2] The government joined each of Reed's motions to continue trial. Nonetheless, we assess the bulk of the responsibility for these jointly sought continuances to Reed, as his repeated hostility towards court-appointed counsel necessitated his changes in representation, and his changes in representation in turn necessitated the latter two continuances. As to the first continuance, responsibility is at best equally shared, as the two reasons cited to justify the continuance included (1) Reed's counsel's need for additional time to review the evidence and (2) the parties' shared need for additional time to engage in plea negotiations.

to suppress in this interval, which the district court did not resolve until March 2020. Because these holdups stemmed from Reed himself, the first eleven months of Reed's pretrial delay weigh in the government's favor. *Id.*

Over the following two years — March 2020 to March 2022 — pandemic-related delays converged with Reed's subsequent pretrial motions to further postpone his trial. In March 2020, the COVID-19 pandemic struck the United States, and on the same day that the district court denied Reed's motion to suppress, the chief judge of the Eastern District of Michigan issued an administrative order suspending all in-court proceedings indefinitely. E.D. Mich. 20-AO-021. Four months later, in July 2020, the chief judge extended the suspension. E.D. Mich. 20-AO-039. In-person jury trials did not resume in the Eastern District of Michigan until September 2021. E.D. Mich. 21-AO-023.

Meanwhile, Reed's third attorney moved for a competency evaluation. The district court granted the request in June 2020, but pandemic precautions within the Bureau of Prisons prevented Reed's transfer to an appropriate B.O.P. facility for nearly nine months, delaying the filing of Reed's competency evaluation until April 2021. By that time, Reed had grown dissatisfied with yet another court-appointed attorney, and after Reed threatened her with violence, she moved to withdraw from the case. The district court appointed Reed a fourth attorney, and the parties agreed to continue trial until October 2021, allowing Reed's newest lawyer time to familiarize himself with the case and prepare Reed's defense.

Then, a handful of additional pandemic-related delays pushed Reed's trial into 2022. First, the district court's limited capacity for jury trials forced it to continue Reed's trial from October to mid-December. A few days before the scheduled December date, however, Reyes tested positive for COVID-19, and the district court pushed trial into 2022. Finally, jury selection

occurred on January 25, 2022. But as Reed returned to jail that same day, he was exposed to a prisoner who later tested positive for COVID-19. Reed's exposure necessitated yet another adjournment, and the district court resumed his trial at the earliest available opportunity: March 2022.

All told, the delays between April 2019 and March 2022 arose from the COVID-19 pandemic and Reed's numerous pretrial motions, including four seeking replacement or withdrawal of his attorney. This court has repeatedly recognized that continuances necessitated by an unavoidable public health crisis that claimed millions of American lives constitute justifiable delay. *See Allen*, 86 F.4th at 305 (treating delays due to the COVID-19 pandemic as valid and weighing them against the defendant); *United States v. Jones*, No. 21-3252, 2023 WL 1861317, at *8 (6th Cir. Feb. 9, 2023) (same). Moreover, and as we have already discussed, delays owing to the defendant's pretrial motions or requests for new counsel also accrue in the government's favor. *Allen*, 86 F.4th at 305. For these reasons, the second *Barker* factor weighs against Reed's speedy trial claim.

Under the third *Barker* factor, we examine "whether the defendant effectively asserted his speedy trial right." *Flowers*, 476 F. App'x at 63; *see also Barker*, 407 U.S. at 528–29. To that end, we consider how early the defendant asserted the right, how often he did so, and the context in which those assertions occurred. *See United States v. Loud Hawk*, 474 U.S. 302, 314 (1986) (a defendant's assertions of his speedy trial right "must be viewed in the light of [his] other conduct"); *Allen*, 86 F.4th at 305 (under the third *Barker* factor, "courts consider both how early . . . and how often" the defendant asserted his speedy trial right). In Reed's case, the first two considerations present a mixed bag. On the one hand, Reed waited fifteen months after his indictment to first assert his speedy trial right, an interval that far exceeds what we think timely. *See Robinson*,

455 F.3d at 608 (assertion of speedy trial right not timely where defendant filed a motion to dismiss fifteen months after he learned of the criminal complaint against him); *Schreane*, 331 F.3d at 557 ("[The Defendant]'s four-month and three-week delay in invoking his speedy trial right weighs against him."). But on the other hand, Reed raised his speedy trial right on numerous occasions from that point forward, asserting the right in a response brief, on the record during a hearing, and in several handwritten letters to the court. These frequent and unmistakable assertions of his speedy trial right weigh heavily in Reed's favor. *See Maples v. Stegall*, 427 F.3d 1020, 1034 (6th Cir. 2005) (finding that, among other factors, the defendant's "repeated[] and vigorous assertion of his speedy trial right weighs strongly in his favor").

Given that these first two considerations present something of an equilibrium, we turn to the final consideration — the context surrounding Reed's invocation of his speedy trial right. And in that effort, we find that Reed's many assertions of his speedy trial right belie his overall dilatory approach to the litigation. *See Loud Hawk*, 474 U.S. at 315 (in applying *Barker*'s third factor, defendants' "repetitive and unsuccessful motions" outweighed their repeated assertions of their speedy trial rights). Reed agreed to continue his trial date several times, including after invoking his right to a speedy trial, which suggests that his demands for a speedy trial may not have been wholly sincere. *Allen*, 86 F.4th at 306 (defendant's consent to subsequent continuances "cast[] doubt on the 'sincerity'" of earlier assertions of his speedy trial right (quoting *United States v. Sutton*, 862 F.3d 547, 561 (6th Cir. 2017))). Moreover, Reed "filled the [d]istrict [c]ourt's docket" with repeated requests for different representation, imposing significant delays as his new attorneys familiarized themselves with his case.[3] *Loud Hawk*, 474 U.S. at 315. Thus, although

---

[3] One point of emphasis: the record overwhelmingly suggests that Reed's bellicose demeanor and racist attitudes played an outsized role in his repeated requests for new representation. In other words, Reed, not his attorneys, bears sole responsibility for his revolving door of representation,

Reed asserted his speedy trial right many times, the repeated delays he either agreed to or personally caused contradict those assertions to such an extent that the third *Barker* factor weighs in the government's favor.

Finally, the fourth *Barker* factor requires that the defendant show "that 'substantial prejudice' has resulted from the delay." *Robinson*, 455 F.3d at 608 (quoting *Schreane*, 331 F.3d at 557). We assess this factor in light of the three protections that the speedy trial right is meant to provide: (i) the prevention of "oppressive pretrial incarceration"; (ii) the minimization of the "anxiety and concern of the accused"; and (iii) the limitation of "the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The third is the "most serious," because a defendant's inability to adequately prepare his defense "skews the fairness of the entire system." *Id.*

The only prejudice that Reed claims he suffered is the oppression imposed by his lengthy pretrial incarceration. But "[w]hen the government prosecutes a case with reasonable diligence" — as we find it did here — "a defendant who cannot demonstrate how his defense was prejudiced *with specificity* will not make out a speedy trial claim no matter how great the ensuing delay." *United States v. Young*, 657 F.3d 408, 418 (6th Cir. 2011) (quoting *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000)); *see also Allen*, 86 F.4th at 306 (defendants' failure to show a "'specific' harm to their defense" doomed their Sixth Amendment claims where the defendants "requested many of the delays themselves and . . . the government had a valid pandemic-related reason for the other continuances" (quoting *Howard*, 218 F.3d at 564)). Reed fails to assert, much less explain, how his lengthy prosecution prejudiced his defense. Because the delays in Reed's

---

as he chased four court-appointed lawyers away through personal insults, race-based attacks, and threats of violence.

prosecution owed to either the COVID-19 pandemic or to Reed himself, this failure proves sufficient by itself to weigh the fourth factor in the government's favor. *Allen*, 86 F.4th at 306.

In sum, we find that while the duration of Reed's prosecution weighs in his favor, the remaining three *Barker* factors militate against his speedy trial claim. Reed bears much of the responsibility for the pretrial delay, and the remainder of the blame lies not with the government, but with the difficult realities imposed by the COVID-19 pandemic. Although Reed asserted his Sixth Amendment right many times, his conduct belied his words. And most critically, Reed cannot demonstrate that his defense was impaired by the protracted pretrial period, indicating that any prejudice he suffered fails to rise to the level of constitutional concern. Under the totality of the circumstances, Reed was not deprived of his speedy trial right, and his Sixth Amendment claim therefore fails.

## C.

We end our analysis with Reed's claim that the delay between his indictment and trial violated the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Generally speaking, the Speedy Trial Act requires that a defendant's trial begin within seventy days of the later of his arraignment or the filing of the indictment. *Id.* § 3161(c)(1). But the Act also enumerates several exceptions to this general rule. *Id.* § 3161(h). Excluded from the seventy-day running tally, for example, is "[a]ny period of delay resulting from a continuance granted by [the district court] . . . on the basis of [its] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). We review the district court's legal rulings under the Speedy Trial Act de novo, and we review its factual findings for clear error. *United States v. Sobh*, 571 F.3d 600, 602 (6th Cir. 2009). The district court's decision to grant an

ends-of-justice continuance survives our review unless it amounts to an abuse of discretion. *United States v. Williams*, 753 F.3d 626, 635 (6th Cir. 2014).

The parties agree that fifty non-excludable days passed in the beginning stages of Reed's prosecution. They further agree that the bulk of the remaining days preceding Reed's 2022 trial are excludable under the Act. Where they disagree is with respect to an approximately month-long period straddling January and February 2021.[4] Reed claims that the government lacks a § 3161(h) exclusion to justify this thirty-two-day delay. The government argues that three § 3161(h) exclusions — including the district court's ends-of-justice finding related to the COVID-19 pandemic — cover the disputed period.

Before we reach the merits, we take up the threshold question of waiver. While neither party briefs the issue, we perceive a compelling argument that Reed waived his Speedy Trial Act rights through his failure to move for dismissal before the district court. 18 U.S.C. § 3162(a)(2). The Act provides, in no uncertain terms, that the "failure of the defendant to move for dismissal prior to trial . . . shall constitute a waiver of the right to dismissal." *Id.* And here, although Reed raised his Speedy Trial Act rights in handwritten letters to the court and in opposition to one of the government's motions to adjourn, he never moved to dismiss pursuant to the Act. Under a straightforward interpretation of § 3162(a)(2), and as several unpublished decisions of this court have held, a defendant in Reed's shoes has waived his right to dismissal under the Act.[5] *See United*

---

[4] The parties also dispute the status of a six-day period in July 2021. Given its brevity, however, resolving whether this period proves excludable or non-excludable is immaterial to deciding whether the district court upheld Reed's rights under the Act. We therefore refrain from addressing it.

[5] Even if we charitably interpreted Reed's interjection at the October 2021 motion hearing as an oral motion to dismiss under the Speedy Trial Act (an interpretation that his attorney's subsequent clarification unequivocally contradicts), that motion would still prove insufficient to preserve

*States v. Coleman*, 835 F. App'x 73, 75 (6th Cir. 2020); *United States v. Dunn*, No. 09-5837, 2011 WL 11533293, at *2 (6th Cir. Dec. 15, 2011); *United States v. Obi*, 85 F. App'x 440, 444–45 (6th Cir. 2003); *United States v. Pike*, No. 94-5104, 1995 WL 234667, at *2 (6th Cir. Apr. 20, 1995). Nevertheless, the published precedent of this court dictates that Reed's objections, though not articulated in a motion to dismiss, suffice for purposes of § 3162(a)(2)'s motion requirement. *See United States v. Brown*, 819 F.3d 800, 822–26 (6th Cir. 2016) (finding that a defendant's "oral objection to an alleged STA violation" without a motion to dismiss satisfies § 3162(a)(2)'s motion requirement "so long as the defendant brings to the court's attention his belief that his STA rights have been violated"). Although some might question the wisdom of this holding, *United States v. Tolliver*, 949 F.3d 244, 250 (6th Cir. 2020) (Thapar, J., concurring), we are not at liberty to ignore it, *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009). Accordingly, we find that Reed preserved his Speedy Trial Act rights for appeal.

Waiver aside, Reed's Speedy Trial Act claim nevertheless fails on the merits. In its November 2021 Order granting the government's motion to adjourn trial, the district court found that the disputed thirty-two-day period was excludable pursuant to the ends-of-justice findings in the Eastern District of Michigan's March 2020 administrative order. And "the Sixth Circuit has already held that a district court does not abuse its discretion in finding that the ends of justice served by postponing or limiting jury trials during the pandemic under the General Orders outweigh a defendant's right to a speedy trial." *United States v. Caldwell*, Nos. 22-3547/3931, 2023 WL 5021548, at *3 (6th Cir. Aug. 7, 2023) (quoting *Jones*, 2023 WL 1861317, at *7).

---

Reed's rights under the Act, as Reed failed to secure a ruling on the supposed motion. *United States v. Hagar*, 822 F. App'x 361, 368–69 (6th Cir. 2021).

Moreover, while the district court issued its ends-of-justice finding nearly eight months after the disputed period came and went, "the findings upon which an 'ends of justice' continuance is granted need not be included in the record at the time of the granting of the continuance[.]" *Brown*, 819 F.3d at 814 (quoting *United States v. Richmond*, 735 F.2d 208, 215 (6th Cir. 1984)). So long as the district court relies on "permissible factors" and does not traffic in post-hoc rationalizations, its later explanation for an earlier continuance will suffice.[6]  *Id.* (quoting *Richmond*, 735 F.3d at 215–16).  Here, nothing in the district court's explanation for its earlier ends-of-justice continuance approached a fabricated, after-the-fact rationalization.  The Eastern District of Michigan did not conduct jury trials in January and February 2021 due to COVID-19. E.D. Mich. 21-AO-023 (noting that the Eastern District's courthouses reopened to the public in September 2021).  The district court's reliance on the chief judge's administrative order, which itself cited COVID-19 as necessitating the suspension of in-person proceedings, is therefore not a post-hoc rationalization.  Accordingly, the district court did not abuse its discretion, and the disputed period was properly excluded from its tally under the Act.  *See Sobh*, 571 F.3d at 602–04.  Reed's Speedy Trial Act claim fails.

III.

For the foregoing reasons, we affirm Reed's conviction.

---

[6] Of course, a district court's ends-of-justice explanation for an earlier continuance "must be put on the record by the time a district court rules on a defendant's motion to dismiss under [the Act]." *Zedner v. United States*, 547 U.S. 489, 506–07 (2006).  But as already discussed, Reed never moved to dismiss under the Act, so that timing requirement is irrelevant here.